<u>**EXHIBIT 1**</u>

DEPOSITION OF

KEVIN W. THARP

HENDERSON V. UNITED STUDENT AID FUNDS

TAKEN ON

MARCH 8, 2016



THE SULLIVAN GROUP
OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM

PHONE 855.525.3860 | 323.938.8750

**EXHIBIT 1 - PAGE 1**

```
 1         UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF CALIFORNIA
 2         CASE NO.:  3:13-cv-1845-JLS-BLM
 3
 4   SHYRIAA HENDERSON, on behalf    )
     of herself and all others       )
 5   similarly situated,             )
                                     )
 6         Plaintiff,                )
                                     )
 7     vs.                           )
                                     )
 8   UNITED STUDENT AID FUNDS, INC.,)
     D/B/A USA FUNDS,                )
 9                                   )
           Defendant.                )
10   _____)
11
12        The 30 (b)(6) deposition upon oral examination
     of KEVIN W. THARP, a witness produced and sworn
13   before me, Linda C. Callahan, a Court Reporter and
     Notary Public in and for the County of Hamilton,
14   State of Indiana, taken on behalf of the Plaintiff
     in the offices of Alliance Court Reporting, 13295
15   Illinois Street, Suite 218, Carmel, Hamilton
     County, Indiana, on the 8th day of March, 2016,
16   commencing at 9:05 a.m., pursuant to the Federal
     Rules of Civil Procedure, and by Notice of the
17   parties as to time and place thereof.
18
19
20
21
22
23
24   Reported by:
     LINDA C. CALLAHAN
25   No. 16-39251
```

Page 2
```
 1            A-P-P-E-A-R-A-N-C-E-S
 2
     FOR THE PLAINTIFF:
 3   EDELSON PC
     BY:  NICK LARRY, ESQ.
 4   350 North LaSalle Street
     Suite 1300
 5   Chicago, IL  60654
 6
     FOR THE DEFENDANT:
 7   VEDDER PRICE
     BY:  LISA M. SIMONETTI, ESQ.
 8   1925 Century Park East
     Suite 1900
 9   Los Angeles, CA  90067
10
     ALSO PRESENT:
11   Julie Ragsdale, Esq.
     USA Funds
12
13       I-N-D-E-X   O-F   E-X-A-M-I-N-A-T-I-O-N
14                                          PAGE
15
     BY MR. LARRY:                            3
16
17       I-N-D-E-X   O-F   E-X-H-I-B-I-T-S
18                                          PAGE
19   1 -       Notice, attachments           6
20   2 -  Fifth Restated Guarantee Agreement 22
21   3 -     2015 Collections Audit Guide    70
22   4 -  8-5-10 St. Peters/Lauth letter     85
23   5 -     2014 Collections Audit Guide    128
24   6 -         Audit Report                131
25
```

Page 3
```
 1             KEVIN W. THARP,
 2         having first been duly sworn,
 3       was examined and testified as follows:
 4
 5              EXAMINATION
 6
 7   BY MR. LARRY:
 8   Q.  Would you please state your full name for the
 9       record.
10   A.  Kevin W. Tharp.
11   Q.  And can you spell Tharp, please.
12   A.  T-H-A-R-P.
13   Q.  And have you ever been deposed before?
14   A.  I have.
15   Q.  Okay.  Well, even though you've been deposed
16       before, I'll still going to run through some basic
17       rules so that we're all on the same page.  As I'm
18       sure you remember, the general format is I'm going
19       to ask you question, you're going to answer.  From
20       time to time, defendant's attorney may object.  If
21       that happens, you need to wait for her to finish
22       her objections, and then generally speaking, I'm
23       going to ask that you go ahead and answer the
24       question unless she's instructing you not the
25       answer.
```

Page 4
```
 1       I'll probably ask some questions that don't
 2   make any sense, whether it's because of the way I
 3   phrase them, because I haven't spoken clearly, or
 4   because the question just itself inherently
 5   doesn't make sense.  If that's the case, ask me to
 6   either repeat the question or just say that you
 7   don't understand and I'll try to ask a better
 8   question.
 9       Because there's a court reporter here, you
10   need to speak clearly, everything is being
11   transcribed, and all your answers need to be
12   spoken, no head nodding, no huh-uhs or shoulder
13   shrugs or anything like that.  For the same
14   reason, you need to wait until I finish asking my
15   question before you start to answer; that way,
16   we're not talking over each other, and I'll do my
17   best to not ask questions while you're still
18   answering.
19       We'll take a few breaks throughout the day.
20   We'll probably take a lunch break.  If you need to
21   take a break at any point, just say so, whether
22   it's just to get up and stretch your legs.  The
23   only restriction is if I've asked a question and
24   you haven't answered it yet, I would ask that you
25   not try to take breaks at those times, but
```

Page 9

1  A.  I do not.
2  Q.  Do you remember what that case was about at all?
3  A.  Administrative wage garnishment.
4  Q.  And it was just -- is it just the one case where
5      you've testified in court?
6  A.  I've testified on several different occasions
7      over the years.
8  Q.  Any idea how many times?
9  A.  Five or six, probably.
10 Q.  Do you remember any of the names of the lawsuits?
11 A.  I do not.
12 Q.  Okay.  Was USA Funds a defendant in any of those
13     lawsuits?
14 A.  They were.
15 Q.  Do you know how many of them?
16 A.  I do not.
17 Q.  Did you do anything to prepare for your deposition
18     today?
19 A.  I have.
20 Q.  And what did you do?
21 A.  I met with counsel, and they outlined for me the
22     deposition process.
23 Q.  Did you do anything else?
24 A.  Reviewed some of the documents that have been
25     filed with the court.

Page 10

1  Q.  Do you recall which documents?
2  A.  Not all the documents, but the depositions, the
3      interrogatories.
4  Q.  That's all you can recall?
5  A.  Yes.
6  Q.  Did you talk to anyone from USA Funds who isn't a
7      lawyer in preparation for today's deposition?
8  A.  My boss.
9  Q.  And who is your boss?
10 A.  Rick Buckingham.
11 Q.  Buckingham spelled like the palace?
12 A.  Yes.
13 Q.  And what is Rick's job title?
14 A.  He's vice president of FFELP operations.
15 Q.  And what did you talk to Rick about in preparation
16     for today's deposition?
17 A.  Just that this litigation was going on and that I
18     was being deposed and generalities of the suit
19     that's been brought.
20 Q.  Did you talk to any other non-attorneys from USA
21     Funds in preparation for today's deposition?
22 A.  No.
23 Q.  And when did you talk to Rick?
24 A.  Several times over the last week.
25 Q.  Did Rick provide you with any of the information

Page 11

1      you're testifying about today?
2  A.  He did not.
3  Q.  Is USA Funds your current employer?
4  A.  Yes.
5  Q.  How long have you been with USA Funds?
6  A.  34 years.
7  Q.  And what is your current job title?
8  A.  Manager, delinquency and default management.
9  Q.  And is delinquency and default management a
10     business unit or division of USA Funds?
11 A.  It's part of the FFELP division.
12 Q.  And what do you generally do as a manager in the
13     delinquency and default management group?
14 A.  I have responsibility for overseeing the
15     portfolio of both our delinquency and defaulted
16     loans.  I work with our servicer in -- in
17     administering that program.
18 Q.  When you say our servicer, are you referring to
19     Navient?
20 A.  I am.
21 Q.  Are there any other services you work with?
22 A.  No.
23 Q.  You mentioned Rick.  Do you have any other
24     immediate supervisors?
25 A.  He's my immediate supervisor.

Page 12

1  Q.  Do you have any immediate subordinates?
2  A.  No.
3  Q.  How long have you had your current job title?
4  A.  Probably 20 years.
5  Q.  What does USA Funds do, generally speaking?
6  A.  We're a guarantor in the FFELP program, national
7      guarantor.
8  Q.  What does a guarantor do with respect to FFELP
9      loans?
10 A.  When a student receives a loan through a lender,
11     those loans are normally guaranteed by different
12     agencies.  USA Funds happens to be one of those
13     agencies.  In the event that the loan defaults,
14     that guarantor will pay that default claim to the
15     lender, and then we assume responsibility for
16     that loan.
17 Q.  And USA Funds also acts as a guarantor for private
18     loans; correct?
19 A.  We have a very small private loan portfolio.
20 Q.  Are you able -- how big is the FFELP loan
21     portfolio?
22 A.  Just under seven billion.  Now, that's the
23     default portfolio.
24 Q.  Are you -- what about the FFELP delinquency
25     portfolio?

Page 13

1  A. It's much larger. Those are loans that are still
2     in the hands of lenders and servicers.
3  Q. So what is USA Funds' role with respect to
4     delinquent loans?
5  A. When a loan becomes 60 days or greater past due,
6     so these would be delinquent loans, not
7     defaulted, the lender would file a request with
8     the guarantor to help resolve the delinquency.
9  Q. So what does USA Funds do to help resolve the
10    delinquency?
11 A. We contract with Navient, it's actually a company
12    called Student Assistance -- I'm trying to think.
13    We call them SAC, Student Assistance Corporation,
14    and they're a division of Navient.
15 Q. And what has USA Funds contracted Student
16    Assistance Corporation to do with respect to the
17    student loans?
18 A. They would be contracted to contact the borrower
19    and make arrangements for the borrower to bring
20    the account current and/or help the borrower with
21    deferment, forbearance options if the borrower is
22    eligible and entitled.
23 Q. So let me know if I understand this right: As far
24    as delinquent FFELP loans are concerned, once the
25    60-day past due period hits, USA Funds comes in

Page 14

1     and essentially begins overseeing the servicing
2     process and brings in Student Assistance Corp to
3     service the loan until it's no longer delinquent?
4  A. We've contracted with Student Assistance
5     Corporation to do the work, to manage the loans,
6     make the calling efforts, and that's what we've
7     contracted with them to do.
8  Q. Once the loan is no longer delinquent, what
9     happens?
10 A. It stays with the lender or the servicer, and the
11    borrower would continue whatever is going on in
12    that borrower's history. He would either
13    continue to make payments; if he went back to
14    school, he would be given a deferment, the loan
15    would be considered in good standing and not
16    delinquent.
17 Q. And so once it's no longer delinquent, USA Funds
18    and Student Assistance Corp, are they -- do they
19    continue to deal with it on a day-to-day basis?
20 A. They do not.
21 Q. Okay. So you said the FFELP default portfolio is
22    about $7 billion. Do you have any idea how big
23    the FFELP delinquency portfolio is?
24 A. Not offhand, I do not.
25 Q. Is it multiples of the seven billion?

Page 15

1  A. Yeah, it's -- I don't know.
2  Q. What about the private portfolio?
3  A. Very small.
4  Q. Do you have any idea how small?
5  A. I do not.
6  Q. Would it be less than a billion?
7  A. Oh, yes.
8  Q. Okay. So with regard to the FFELP default
9     loans, what does Navient do for USA Funds?
10 A. They contract with outside collection agencies to
11    pursue those loans for payment.
12 Q. And you said there are no other servicers that USA
13    Funds works with to do that; correct?
14 A. That's correct.
15 Q. So going back, with the exclusion of -- well, just
16    for purposes of clarity for the rest of the
17    deposition, when I'm referring to Navient, I know
18    that previously, they were part of Sallie Mae.
19    I'm referring to the same entity going back; does
20    to make sense?
21 A. Yes.
22       MS. SIMONETTI: The prior entity was
23    Sallie Mae, Inc.
24       MR. LARRY: Yes, Sallie Mae.
25       MS. SIMONETTI: And the current

Page 16

1     entity is Navient Solutions, Inc., and I think in
2     the other deposition, we used NSI rather than the
3     Navient name.
4        MR. LARRY: I'm fine using either;
5     whichever is easiest for you, Navient or NSI.
6        MS. SIMONETTI: As long as we
7     understand that we're talking about Navient
8     Solutions Inc., is that --
9        MR. LARRY: That's correct.
10       MS. SIMONETTI: Is it?
11       MR. LARRY: Yes.
12 Q. And actually, to clarify, is -- well, actually --
13    never mind. So when I say Navient, I'm referring
14    to NSI and also previously Sallie Mae, Inc. when
15    it was known as that.
16       For how long has USA Funds been acting as a
17    guarantee agency on federal student loans?
18 A. Sixty years.
19 Q. And how far back has Navient, NSI, Sallie Mae,
20    been the exclusive servicer of USA Funds, FFELP
21    default loans?
22 A. Since 2003, 2002.
23 Q. And were there other servicers prior to that,
24    then?
25 A. There was a company called USA Group.

Page 133

1 called on?
2 A. I did not.
3 Q. So if I were to read you those numbers, they
4    wouldn't mean anything to you?
5 A. They would not mean anything to me.
6 Q. Did you look into how the vendors obtained the
7    telephone numbers that they called?
8 A. I did not.
9 Q. So as you sit here today, you have no idea how
10   Pioneer Credit Recovery obtained Ms. Henderson's
11   cell phone numbers?
12 A. No.
13 Q. And the same is true for GC Services, General
14   Revenue Corporation, National Enterprises, and NCO
15   Group?
16 A. Yes.
17 Q. Going back to Exhibit 6, are you able to tell --
18   is there anything from the face of this document
19   that tells you which vendor this come from?
20 A. Not for me, it did not.
21 Q. Okay. When I was asking about the specific
22   vendors who called earlier, you mentioned that
23   there was a document reviewed -- you reviewed that
24   listed off the vendors who called the plaintiff;
25   correct?

Page 134

1 A. Yes.
2 Q. Do you recall which document you were talking
3    about?
4 A. It was an e-mail that I had received from
5    Navient.
6 Q. Okay. So aside from that e-mail, have you
7    received any -- actually, let me take a step back.
8    When you said you received the Navient, you mean
9    that Navient sent that to you or it was an e-mail
10   sent from Navient that was later provided to you?
11 A. I had requested background information on Mrs.
12   Henderson, and Navient was responding via e-mail
13   with that background information.
14 Q. Okay. Aside from that e-mail identifying the
15   vendors who called Ms. Henderson, have you made
16   any other efforts to obtain information from
17   Navient or any of the vendors relating to the
18   calls made to Ms. Henderson?
19 A. No.
20 Q. Has Navient subsequently provided any of that
21   information to you?
22 A. Not that I'm aware of.
23 Q. What about any of the vendors themselves?
24 A. No.
25 Q. You mentioned that you had -- that in response to

Page 135

1    the filing of the plaintiff's Complaint, you
2    weren't aware of any investigation into those
3    vendors' calling practices by USA Funds; correct?
4 A. Correct.
5 Q. Do you know whether USA Funds requested that those
6    vendors assess their own internal practices to
7    determine whether the calls were proper or not?
8 A. None that I'm aware of.
9 Q. Did USA Funds do any investigation to determine
10   whether a refund or a credit against an
11   outstanding balance was appropriate for Ms.
12   Henderson's account?
13 A. None that I'm aware of.
14          MR. LARRY: I think now is a good
15   time for the one o'clock break.
16          MS. SIMONETTI: Okay, sounds good.
17          (At this time, a recess was taken.)
18 Q. Mr. Tharp, we talked a bit a few minutes ago
19   before the break about the e-mail you received
20   from Navient. I just wanted to talk about that
21   real quick. Is your e-mail address
22   kevin.tharp@usafunds.org?
23 A. Yes.
24 Q. Do you recall the e-mail address that the e-mail
25   from Navient came from or who it was?

Page 136

1 A. I think it came from Mark Verbrugge.
2 Q. Do you know his e-mail address?
3 A. I believe it's Mark -- you know what, I don't
4    know. It's in my Rolodex, and -- I'm sorry.
5 Q. Not a problem. Okay. So you mentioned that
6    the -- in the course of reviewing the information
7    that was available to you about Ms. Henderson's
8    account, were you able to tell when her last
9    payment was?
10 A. I could tell. I don't remember looking at it
11   specifically.
12 Q. And we talked a bit earlier, as well, about the
13   auditing process and how the borrower accounts are
14   randomly selected. Do you know whether Ms.
15   Henderson's account was ever included in the
16   audit?
17 A. Not that I'm aware of.
18 Q. Is that something you'd be able to determine?
19 A. I can ask the auditors. I don't know that they
20   would even know.
21 Q. Okay. If we go back to Exhibit 4 which was the
22   audit report, this one --
23 A. Yes.
24 Q. You should get it out. If you turn to Appendix A
25   for that, so near the end.

Page 141

1  it.
2  Q. And you also talked earlier about the situations
3  in which your counterparts at Navient would e-mail
4  you to inform you of either a trend of borrower
5  complaints or a particularly important borrower
6  complaint that might come through. Would those
7  e-mails be retained beyond sort of the normal
8  retention period?
9  A. No.
10 Q. So they would be deleted along the timelines of
11 whatever the standard deletion period is?
12 A. Correct.
13 Q. Do you know what that timeline is?
14 A. Depending on the document, it could be anywhere
15 between 5 and 10 years.
16 Q. Okay. And do you know what the timeline is for
17 e-mails that are deleted, deleted within the
18 inbox, how long they stay in the trash or
19 something?
20 A. I don't know that.
21 Q. What about e-mails that are not deleted, so
22 e-mails that are read but never deleted by the
23 recipient?
24 A. The company has a standard, but I don't know what
25 it is.

Page 142

1  Q. Okay.
2  A. They're auto-deleted, I believe.
3  Q. Do you know whether that is in excess of a year?
4  A. I don't know.
5      MR. LARRY: That's all I have for
6  now. As I said earlier, we're going to follow up
7  regarding the documents that we believe should
8  have been produced as an attachment with some of
9  the audit guide and other things, but those are
10 all the questions I have for now. We're done.
11     MS. SIMONETTI: Last time, we agreed
12 that you would send the transcript to me and then
13 I think that we agreed that it would be 30 days
14 after. I think that still works.
15     MR. LARRY: Can we do a rough draft,
16 but I don't need the expedite this time.
17     MS. SIMONETTI: Yeah, I'd like a
18 rough, too.
19
20
21     (Ending time: 1:28 p.m.)
22
23
24
25

Page 143

1  STATE OF _____)
                    )
2  COUNTY OF _____)
3
4     I, the undersigned, declare under penalty of
5  perjury that I have read the foregoing transcript,
6  and I have made any corrections, additions, or
7  deletions that I was desirous of making; that the
8  foregoing is a true and correct transcript of my
9  testimony contained therein.
10
11     Executed this _____ day of _____, 20__,
12 at:
13
14
15
16
17
18     _____
19        KEVIN W. THARP
20
21
22
23
24
25

Page 144

1     DEPONENT'S CHANGES OR CORRECTIONS
2  Note: If you are adding to your testimony, print
3  the exact words you want to add. If you are deleting
4  from your testimony, print the exact words you want
5  to delete. Specify with "Add" or "Delete" and sign
6  this form.
7
8  DEPOSITION OF:    KEVIN W. THARP
9  CASE:             HENDERSON V. UNITED STUDENT AID FUNDS
10 DATE OF DEPOSITION: MARCH 8, 2016
11
12 PAGE  LINE  CHANGE/ADD/DELETE
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
25 Deponent's Signature _____ Date _____

Page 145

```
 1  PAGE    LINE    CHANGE/ADD/DELETE
 2  ____    ____    _____
 3  ____    ____    _____
 4  ____    ____    _____
 5  ____    ____    _____
 6  ____    ____    _____
 7  ____    ____    _____
 8  ____    ____    _____
 9  ____    ____    _____
10  ____    ____    _____
11  ____    ____    _____
12  ____    ____    _____
13  ____    ____    _____
14  ____    ____    _____
15  ____    ____    _____
16  ____    ____    _____
17  ____    ____    _____
18  ____    ____    _____
19  ____    ____    _____
20  ____    ____    _____
21  ____    ____    _____
22  ____    ____    _____
23  ____    ____    _____
24  ____    ____    _____
25  Deponent's Signature _____ Date _____
```

Page 146

```
 1             REPORTER'S CERTIFICATE
 2
 3       I, LINDA C. CALLAHAN, a Court Reporter and
    Notary Public, certify;
 4
         That the foregoing proceedings were taken
 5  before me at the time and place therein set forth,
    at which time, the witness was put under oath by
 6  me;
 7       That the testimony of the witness, the
    questions propounded, and all objections and
 8  statements made at the time of the examination
    were recorded stenographically by me and were
 9  thereafter transcribed;
10       That the foregoing is a true and correct
    transcript of my shorthand notes so taken.
11
         I further certify that I am not a relative or
12  employee of any attorney of the parties, nor
    financially interested in the action.
13
         I declare under penalty of perjury under the
14  laws of Indiana that the foregoing is true and
    correct.
15
         Dated this 20th day of March, 2016.
16
17
18  _____
19            LINDA C. CALLAHAN
20
21
    My county of residence:  Hamilton
22  My commission expires:   11/3/16
23
24
25
```