**EXHIBIT 3**

DEPOSITION OF

MARK A. VERBRUGGE

HENDERSON V. UNITED STUDENT AID FUNDS

TAKEN ON

FEBRUARY 23, 2016



THE SULLIVAN GROUP
OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM

PHONE 855.525.3860 | 323.938.8750

**EXHIBIT 3 - PAGE 13**

### Page 1

```
 1   IN THE UNITED STATES DISTRICT SOUTHERN DISTRICT OF
 2                        CALIFORNIA
           CASE NO.:  3:13-cv-1845-L-BLM
 3                     CLASS ACTION
 4
     SHYRIAA HENDERSON, on Behalf  )
 5   of Herself and all others     )
     similarly situated,           )
 6                                 )
              Plaintiff,           )
 7                                 )
        vs.                        )
 8                                 )
     UNITED STUDENT AID FUNDS, INC.)
 9   D/B/A USA FUNDS,              )
                                   )
10            Defendant.           )
                                   )
11   _____)
12
         The 30(b)(6) deposition upon oral examination
13   of MARK A. VERBRUGGE, a witness produced and sworn
     before me, Linda C. Callahan, a Court Reporter and
14   Notary Public in and for the County of Hamilton,
     State of Indiana, taken on behalf of the Plaintiff
15   in the offices of Alliance Court Reporting, 13295
     N. Illinois Street, Suite 218, Carmel, Hamilton
16   County, Indiana, on the 23rd day of February,
     2016, commencing at 9:00 a.m., pursuant to the
17   Federal Rules of Civil Procedure, and by Notice of
     the parties and subpoena of the witness as to time
18   and place thereof.
19
20
21
22
23
24   Reported by:
     LINDA C. CALLAHAN
25   No. 16-39252
```

### Page 2

```
 1                  A-P-P-E-A-R-A-N-C-E-S
 2
     FOR THE PLAINTIFF:
 3   EDELSON PC
     BY:  NICK LARRY, ESQ.
 4   350 North LaSalle Street
     Suite 1300
 5   Chicago, IL  60654
 6
     FOR THE DEFENDANT:
 7   VEDDERPRICE
     BY:  LISA M. SIMONETTI, ESQ.
 8   1925 Century Park East
     Suite 1900
 9   Los Angeles, CA 90067
                  and
10   MATTHEW R. SHELDON, ESQ.
     NAVIENT SOLUTIONS, INC.
11   2001 Edmund Halley Drive
     Reston, VA 20191
12
13   ALSO PRESENT:
     Courtney Booth, Esq.
14
15
           I-N-D-E-X   O-F   E-X-A-M-I-N-A-T-I-O-N
16
                                              PAGE
17
18   BY MR. LARRY:                             4
     BY MS. SIMONETTI:                         160
```

### Page 3

```
                 I-N-D-E-X   O-F   E-X-H-I-B-I-T-S

                                              PAGE

     1 -            Subpoena                    7
     2 -   Guarantee Service Agreement, USAF   24
     3 -   Defaulted Collection Agreement      55
     4 -   Navient 2014 Aqudit Guide           68
     5 -   Sallie Mae 2014 Portfolio Mgmt      74
     6 -   Navient Portfolio Mgmt, 1-1-15      109
     7 -        Audit Report                   133
     8 -        GRC   Agreement                148
```

### Page 4

 1          MARK A. VERBRUGGE,
 2       having first been duly sworn,
 3       was examined and testified as follows:
 4
 5              EXAMINATION
 6
 7   BY MR. LARRY:
 8   Q. Would you please state your full name for the
 9      record.
10   A. Mark Allen Verbrugge.
11   Q. Can you spell your last name, please.
12   A. V as in Victor, E-R, B as in baker, R-U-G-G-E.
13   Q. And Mr. Verbrugge, have you been deposed before?
14   A. No.
15          MR. LARRY: Okay. Well, I'll go over
16      some ground rules so that we're on the same page
17      so that everything goes as smoothly as possible.
18      I'm sure you talked about this with the attorney
19      for the defendant in this case, but I'm going to
20      ask questions and you're going to answer them.
21      From time to time, Navient's attorney may object,
22      and in that event, you're going to need to wait
23      for the objection to finish, but generally
24      speaking, I'm going to ask you to answer at the
25      conclusion of the objection. The exception of

Page 21

1   Systems.
2   Q. And what was the reason being?
3   A. Again, performance.
4   Q. Any others?
5   A. Williams Professionals.
6   Q. The reason?
7   A. Performance.
8   Q. Any others that you can think of?
9   A. Those are all I can think of right now.
10  Q. But there could be more out there?
11  A. There could be, yes. You're talking about a
12     pretty long timeframe.
13  Q. Do you recall any -- do you recall whether there
14     were any third-party collection agencies that were
15     released or no longer utilized for reasons other
16     than performance?
17  A. It was all performance related.
18  Q. Okay. So with regard to the loan taken out by the
19     plaintiff in this matter, that was serviced by
20     NSI; correct?
21  A. Correct.
22  Q. And do you know the time period when NSI began
23     servicing that loan?
24  A. I believe it was -- originally goes back as far as
25     2000.

Page 22

1   Q. The loan was defaulted on; correct?
2   A. The loan was defaulted on.
3   Q. And NSI continued to service the loan after it was
4      defaulted on and purchased by USA Funds; correct?
5   A. NSI, -- I can speak to when NSI Portfolio
6      Management began working on the account, and that
7      was in 2000, based upon my recollection of
8      reviewing the account. The collection activities
9      began and the loan was subsequently, I believe,
10     rehabilitated in 2004 to late 2005.
11  Q. What does rehabilitated mean in this context?
12  A. What that means is, and the program still exists
13     today under the FFELP world, if a borrower makes
14     on-time monthly payments -- back then, I'm
15     guessing it was 12 in 2004, it's now nine -- and
16     they make, once again, their required number of
17     and required amount within a 30-day time period,
18     they actually rehabilitate their loan, whereby we
19     sell their loan to a rehabilitating lender, a new
20     lender, they purchase that loan, they expunge the
21     credit bureau reporting as the default never
22     existed, so it basically gives the borrower a
23     brand new chance to, you know, move forward with
24     that repayment of that debt without having any of
25     the negatory comments on the credit bureau report.

Page 23

1   Q. So it's not only treated no longer as being a
2      default, but as if it never happened?
3   A. Correct.
4   Q. And then the loan was subsequently defaulted on
5      again; correct?
6   A. Correct.
7   Q. Do you know when that took place?
8   A. I believe it was 2010.
9   Q. And what is your basis for that understanding?
10  A. Once again, off of the EAGLE system.
11  Q. That's something that's reflected in the system?
12  A. Correct.
13  Q. And if you were to look back in the system now,
14     would you be able to pull an exact date?
15  A. Yes.
16  Q. And did the system have a date for the original
17     default?
18  A. I'm sure it does. I don't recall it exactly, but
19     yes, it would.
20  Q. And would the system also show when the loan was
21     sold to a rehabilitating creditor?
22  A. Yes.
23  Q. And after the subsequent default in 2010, the loan
24     was purchased again by USA Funds; correct?
25  A. Correct.

Page 24

1   Q. And that was reflected in the EAGLE records, as
2      well?
3   A. Yes.
4   Q. And so in the process of servicing plaintiff's
5      loan that had defaulted, NSI used third parties to
6      actually make collection calls; correct?
7   A. Correct.
8   Q. Do you know which third-party collection agencies
9      were used to place calls to plaintiff?
10  A. It's -- I can tell off the system. Off the top of
11     my head, I believe there was five different
12     agencies that had sought -- that had worked this
13     loan after 2010. I believe one was Pioneer Credit
14     Recovery, I believe another was General Revenue
15     Corporation, I believe another one was GC
16     Services, I believe another one at that time was
17     OSI/TSI now, and I believe there was another one,
18     but I can't recall.
19  Q. Does National Enterprise System sound right?
20  A. It does.
21  Q. I'm going to go ahead and give you another exhibit
22     here.
23          (Exhibit No. 2 was marked for
24     identification.)
25  Q. Have you seen the document marked as Exhibit 2

Page 41

1 reports, all reports kept at NSI.
2 Q. Do you know if those reports are provided to USA
3    Funds?
4 A. They are -- upon asked. They are not a typical
5    report that's provided to USA Funds.
6 Q. Did you say upon ask?
7 A. Upon asked, yeah. If they ask for an inventory
8    report, we provide it to them.
9 Q. Have they done so?
10 A. Not to my knowledge. I mean, it wouldn't be a
11    far-fetched question.
12 Q. So I want to ask a little bit about the connection
13    between the audit score and the recommendations.
14    So USA Funds performs its audits on a wide variety
15    of criteria, I assume, that are being audited;
16    correct?
17 A. They have a specific audit guide.
18 Q. And that audit guide provides for an audit score
19    based on compliance with certain criteria; right?
20 A. Sure.
21 Q. So the audit score leads to a recommendation that
22    can either be suspension of placement to a given
23    vendor or a decrease in placements over a given
24    time period; right?
25 A. Correct.

Page 42

1 Q. Do you know whether the recommendation is
2    automatically generated as a result of the audit
3    score?
4 A. Can you rephrase the question?
5 Q. Sure. All I'm asking is say the audit score came
6    out at -- I'm just going to make this up -- 84 out
7    of a 100.
8 A. Uh-huh.
9 Q. Would 84 always mean a two-week suspension?
10 A. There's a scale, yes, that determines what the
11    recommendation typically fits under, yes.
12 Q. And that scale -- so then the recommendation comes
13    from USA Funds to NSI; correct?
14 A. Correct.
15 Q. Okay. And does NSI ever disregard that
16    recommendation?
17 A. Disregard is the wrong word.
18 Q. What is the right word?
19 A. I don't know if there is a right word, but we just
20    don't disregard. We evaluate and we take under
21    strong consideration the recommendations of the
22    audit and the audit score and the recommendation
23    of USA Funds. However, we have to evaluate
24    whether it's the right action to take.
25 Q. Are you aware --

Page 43

1 A. So -- pardon me.
2 Q. Are you aware of instances where NSI has chosen
3    not to take the recommended action?
4 A. I am aware of instances specifically. I can't
5    give you one off the top of my head, but I can
6    assure you that we have not taken 100 percent of
7    all recommendations.
8 Q. Do you have any idea how many recommendations
9    haven't been followed?
10 A. No.
11 Q. Do you have any idea what the percentage is?
12 A. It's -- it would be a guess.
13       MS. SIMONETTI: Don't guess.
14 A. I'm not sure -- I'm not here to guess.
15 Q. Would there be records that you can consult so you
16    wouldn't have to guess?
17 A. We could refer back to every audit and then look
18    at the placement report, yes.
19 Q. And does NSI maintain records of the USA Funds'
20    audit reports?
21 A. NSI, yes.
22 Q. I'm not asking whether you know whether USA Funds
23    maintains those or not, just whether NSI does. So
24    sticking with this document here, are you aware of
25    any time period between the October 1, 1999 date

Page 44

1    listed at the beginning and the present where this
2    agreement that's been marked as Exhibit 2 or any
3    of its subsequent restatements or members have not
4    been in place, has there ever been a lapse in that
5    contract?
6 A. Not that I am aware.
7 Q. Do you know how many accounts NSI, or as it was
8    previously known under Sallie Mae, have serviced
9    for USA Funds since August of 2009?
10 A. No, no.
11 Q. Do you have any sense of the order of magnitude?
12 A. I could -- I have dollar volume, I don't have
13    number of accounts.
14 Q. Okay. What is the dollar volume?
15 A. It currently sits about a little over $6 billion,
16    and probably back in 2010, it exceeded that
17    number, so it's reduced, but I once again would be
18    guessing what the dollar volume was in August or
19    whatever of 2009.
20 Q. Don't guess on that.
21 A. I will not.
22 Q. So you said you weren't able to give a number for
23    number of accounts, but do you have any sense of
24    or is it -- whether it's millions of accounts?
25 A. You could do the math. You know, no, I'm not

Page 117

1 Q. What about USA Funds, are they informed of the
2    dialers used by NSI's vendors?
3 A. No, no.
4 Q. No, they aren't or no, you're not aware?
5 A. No, they are not informed.
6 Q. Do you know whether they're able to get that
7    information as part of their audits?
8 A. No, I'm not aware if they're able to get that.
9 Q. What are the differences -- does Navient itself
10   ever obtain telephone numbers or new telephone
11   numbers for consumers who have NSI loans being
12   serviced by NSI?
13 A. Yes.
14 Q. And how does NSI do that?
15 A. I go back to post-claims assistance, a borrower
16   could call in, and every time the borrower calls
17   in, we verify phone and address, if the caller
18   gives a new phone, we update the system.
19 Q. Are there any other methods you're aware of?
20 A. Could be mail.
21 Q. Any others?
22 A. It could be a call to the OCA, as we talked about
23   earlier.
24 Q. Any others?
25 A. Not that I'm aware of.

Page 118

1 Q. And when NSI receives an account from USA Funds,
2    that typically includes at least one telephone
3    number with it; correct?
4 A. Typically, yes.
5 Q. After NSI has begun servicing accounts, do you
6    know if USA Funds takes any action to obtain
7    additional telephone numbers?
8 A. No, they do not.
9 Q. What about NSI's vendors, do they take any
10   additional action outside of what's provided to
11   them upon origination of the account and outside
12   of what's obtained by NSI and updated in the
13   system, do the vendors take any action to obtain
14   additional telephone numbers for a consumer?
15 A. Yes.
16 Q. And what actions are those?
17 A. They skiptrace.
18 Q. Can you explain what you mean by skiptrace?
19 A. Information in the system isn't always the best
20   available; it may be old, it may have never been
21   good. They have to locate, so skiptracing is
22   another term for locating.
23 Q. We'll come back to skiptracing in a minute, but
24   are there any other methods that you're aware of
25   that NSI's collections vendors use to obtain

Page 119

1    borrower telephone numbers?
2 A. No.
3 Q. So within kind of the universe of skiptracing, do
4    you know whether USA's vendors use any third-party
5    database services to obtain additional telephone
6    numbers for a consumer?
7 A. I'm not aware of who they contract with to get
8    that information.
9 Q. Do you know whether they contract with anyone?
10 A. I assume some do.
11 Q. Do you know whether NSI's auditing process
12   identifies who if any those third parties are?
13 A. I don't believe it does.
14 Q. Within the meaning -- within skiptracing as you
15   used it, would that include a collections vendor
16   calling an individuals relatives, known
17   acquaintances, to attempt to obtain new or updated
18   contact information?
19 A. Yes, it would.
20 Q. And that is something that NSI's vendors do?
21 A. Yes, it is.
22 Q. Does NSI have to approve its vendors skiptracing
23   processes?
24 A. No.
25 Q. Are you aware of NSI ever requesting any changes

Page 120

1    to its vendors skiptracing policies?
2 A. No, I'm not aware.
3 Q. Does NSI place any restrictions on the use -- or
4    on -- yes, on the use of telephone numbers
5    obtained by skiptracing by its vendors?
6 A. They're -- yes, there are some restrictions.
7 Q. And what restrictions do you find?
8 A. Cease would be don't call the -- don't call the
9    phone number; death, deceased, don't call the
10   number. Those are a couple.
11 Q. Any others that you can think of?
12 A. Not sitting here right now, no.
13 Q. What about USA Funds; is USA Funds able to
14   request -- or is USA Funds able to place
15   restrictions on the use of numbers obtained by
16   skiptracing by NSI's collection vendors?
17 A. No.
18 Q. Do you know whether it has ever done so?
19 A. I don't believe it's ever been done.
20 Q. Are you familiar with the phrase number trapping?
21 A. I read it in the document earlier and I'm not
22   familiar with what it is.
23 Q. Are you familiar with any process used by
24   collections vendors to add telephone numbers to
25   the contact database by virtue of those numbers

Page 129

1 asking is if the placement file doesn't include
2 whether any such consent has been granted, do you
3 know whether NSI's auditing process checks to see
4 if maybe the first call to an individual regarding
5 an account is autodialed?
6 A. They check to -- what is given is whether the
7 phone is cell, home, or work, and so the review is
8 to make sure cells are not autodialed.
9 Q. And do you know how NSI determines whether a
10 number is cell, home, or work?
11 A. Some come off the promissory note and originally
12 entered at the time by USA Funds into -- as the
13 claim is purchased, others are retained via
14 skiptracing by prior vendors. But consent does
15 not transfer from agency to agency.
16 Q. So when NSI receives a file from USA Funds, that
17 file indicates whether each given telephone number
18 is cell, home, work?
19 A. Nowadays, it could; on the newer default, it does,
20 yes.
21 Q. It sounds like that wasn't always the case.
22 A. Cell phones didn't always exist.
23 Q. Since -- for the time period from August 8, 2009
24 to the present, has it been the case that USA
25 Funds' files as they come in, has identified what

Page 130

1 type of telephone number?
2 A. Not all the time.
3 Q. In what circumstances won't it do that?
4 A. It has to be notated on the front of the note
5 whether it's a cell.
6 Q. Have you ever heard of the concept of cell
7 scrubbing?
8 A. Sure.
9 Q. And what is your understanding of what that is?
10 A. Phone numbers are put through a variety of like --
11 I guess call, for lack of a better -- scrubs to
12 identify if it's a landline or a cell phone.
13 Q. Sure, okay. I wasn't trying to trip you up, I
14 just wanted to make sure we're on the same page.
15 Do you know whether NSI employs a process, a cell
16 phone scrubbing process, before sending files to
17 its vendors?
18 A. NSI does not.
19 Q. Do you know whether NSI requires its vendors to do
20 so?
21 A. We do not require our vendors to do that.
22 Q. Do you know whether NSI has ever directed its
23 vendors to use cell phone scrubbing?
24 A. No. I don't -- no, we've never directed that.
25 Q. Do you know whether NSI has ever requested a

Page 131

1 vendor to do so?
2 A. No, we have not.
3 Q. Do you know whether USA Funds has ever requested a
4 vendor to do so?
5 A. They have not.
6 Q. Do you know whether they ever directed a vendor to
7 do so?
8 A. They have never directed.
9 MR. LARRY: We have been going for
10 almost an hour now; we're about to go through a
11 detailed and boring exhibit. If people want to
12 break now, it would be a good time.
13 MS. SIMONETTI: I have to take a
14 really quick call at two, so it might be a little
15 longer than five minutes.
16 MR. LARRY: That's fine.
17 Q. If you could go back to Exhibit No. 5 which was
18 the 2014 audit guide.
19 A. Got it.
20 Q. Okay. If you'd turn to what's marked internally
21 as page ten, and do you see above bold heading 6
22 where there's H, "Skip activity"?
23 A. Uh-huh.
24 Q. Does that section mean that there are situations
25 in which NSI requires it collections vendors to

Page 132

1 skiptrace to obtain new telephone numbers?
2 A. Indeed, it does.
3 Q. Do you know whether NSI's audits include a check
4 to make sure that that's occurring?
5 A. It does.
6 Q. And do you know whether NSI has ever directed a
7 vendor who has failed to comply with those
8 provisions to skiptrace?
9 A. If they fail to comply with as written, we
10 obviously notate it as a finding and tell them to
11 take the appropriate action to get back on track
12 with the direction.
13 Q. And that's something that's happened?
14 A. I can't think of a specific example, but, yeah,
15 I'm just going to go with -- I've been in this
16 department for awhile, so yeah. I can't -- I
17 don't have a specific date, timeframe, or agency
18 in which this specific finding has been found.
19 Q. Do you know whether USA Funds has ever requested
20 that one of NSI's vendors increase its use of
21 skiptracing?
22 A. No. This is our policy.
23 Q. Do you know whether USA Funds has ever generally
24 requested that -- or has ever requested that NSI's
25 vendors generally increase their use of

Page 149

1 became a sole entity in 2000 when Sallie Mae
2 acquired USA Group or purchased USA Group
3 Guaranteed Services.
4 Q. What year did you say that was?
5 A. 2000.
6 Q. Do you see in that same paragraph where it says,
7    "Sallie Mae now seeks to update and conform all
8    its collection agency contracts"?
9 A. Uh-huh.
10 Q. Were you employed by Sallie Mae at that time?
11 A. I was.
12 Q. Do you recall that taking place?
13 A. I faintly recall the contracts being revised, yes.
14 Q. Do you know whether since that time, Sallie Mae or
15    now NSI has gone through a process of updating and
16    conforming all of its collection agency contracts
17    with a single effective date?
18 A. The contracts, I believe, with all vendors have
19    been updated as recently as 2015.
20 Q. So the individual contracts have been updated as
21    recently as 2015, but do you know if there's been
22    a vendor, a -- sorry, an NSI-wide update and
23    conformance of its contracts with all of its
24    vendors at the same time at any point since
25    July 1, 2004?

Page 150

1      MS. SIMONETTI: You mean on the USA
2   Funds portfolio?
3      MR. LARRY: We can limit it to that.
4 A. With the USA Funds portfolio? Okay, because I
5   understood your question to mean all vendors
6   across all relationships, even outside the --
7 Q. No. To the extent you understood it to mean that,
8   I'm sorry.
9 A. Okay, no, no -- apology accepted.
10 Q. No, just specifically to USA Funds.
11 A. Again, I believe I answered that. I am -- I
12   believe it was in 2015. I think it was mid 2015,
13   all contracts for vendors working on behalf of USA
14   Funds have been revised and subsequently signed by
15   the appropriate parties.
16 Q. So between that July 1, 2004 time period and the
17   mid 2015 time you just outlined, are you aware of
18   any other similar instances of conforming across
19   USA Funds' vendors?
20 A. I'm not aware of that. No, I'm not aware of a
21   uniformity revision of all contracts across all of
22   USA Funds.
23 Q. And do you recall that his was taking place as a
24   general idea to have contracts similar in form and
25   type and layout across all of the Navient or then

Page 151

1   Sallie Mae USA Funds' vendors?
2 A. I believe at the time -- I would -- can you repeat
3   that, please?
4      (The pending question was read back
5   by the reporter.)
6      MR. LARRY: That's a terrible
7   question. I'm just going to ask a new one.
8 Q. So was the general idea of these vendor-wide
9   changes to have similar contracts across NSI or
10   previously Sallie Mae's group of vendors?
11 A. Consistent wording, correct.
12 Q. Okay.
13 A. And if you look at the cover page, I think it
14   highlights one of the big changes.
15 Q. What happens when a vendor that NSI hires to
16   help -- to collect on a USA Funds loan is able to
17   successfully collect?
18 A. Neal, right?
19 Q. Nick.
20 A. Nick. I did that earlier, too, so I apologize.
21   We're tit for tat on the apologies, right? Nick,
22   I call you today, you agree to pay, how would you
23   like to make that payment? Okay. You know,
24   basically, we can make a credit card payment,
25   electronic fund transfer, how are you making that

Page 152

1   payment. The bottom line, I receive that -- as an
2   agency, they receive the payment today, so call it
3   $50, they apply it to their system today, go back
4   with that effective date and trend date. It's
5   going to have an effective date and a trend date
6   on their system of today's date.
7      They are required to report that payment to me
8   within 24 hours or the next day, so they not only
9   remit that payment to me via electronic file to
10   say, hey, for Nick, we got a $50 payment, this is
11   how we applied to principal, interest, and
12   collections costs, we take it, being that we're
13   the system of record, make sure they applied it
14   correctly, and then follow it up by wiring the
15   funds that next day, as well, so we not only have
16   notification of payment, but we also have the cash
17   in hand for that payment, as well.
18 Q. And then what does NSI do with that payment?
19 A. It automatically applies to the system, to EAGLE.
20   It will then allocate a vendor fee, because
21   they're paid for the services that they produce,
22   say it's 10 percent, make it a number, and the fee
23   tables are in here, it creates a fee table, let's
24   say in your case, it's 10 percent, $5, make sure
25   that you either retained -- because some contracts

Page 161

1 Q. All right. Can I ask you to take a look at
2    Exhibit 1?
3 A. I put my glasses away. All right.
4 Q. And take a look at the section entitled
5    "Definitions" and look for definition No. 13.
6 A. Under --
7 Q. No, "Definitions".
8 A. Sorry.
9 Q. That's all right.
10 A. Got it.
11 Q. Do you agree with me that this reads "Telephone or
12    telephone dialing equipment means or refers to the
13    telecommunications equipment, other telemarketing
14    systems and/or computers or computer systems used
15    to make phone calls"; is that what it says?
16 A. That's what it says.
17 Q. Can you take a look under the subject matter
18    topics, I don't know the page number, put look for
19    topic No. 15.
20 A. All right.
21 Q. Got it?
22 A. Yep.
23 Q. Do you agree with me that this reads, "Telephone
24    dialing equipment used by third parties retained
25    by you, including third-party vendors hired by you

Page 162

1    to make phone calls to plaintiffs, as well as all
2    call recipients from August 8th, 2009 until the
3    present"; is that what it says?
4 A. That's what it says.
5 Q. And I omitted reference when I was reading that to
6    the misspelling of third, but I corrected that;
7    right?
8 A. Correct.
9 Q. Okay. Has it ever been part of NSI's relationship
10    with the vendors on USA's portfolio to obtain
11    information about telephone dialing equipment?
12 A. From a portfolio management's perspective, working
13    with third-party vendors to collect upon USA Funds
14    student loan debt, no.
15 Q. Has portfolio management ever had a business
16    reason to ask for information regarding telephone
17    dialing equipment used by vendors on the USA Funds
18    portfolio?
19 A. No.
20 Q. Are there vendors who provide the services to NSI
21    on USA Funds portfolio responsible for their own
22    telephone dialing equipment?
23 A. They are.
24 Q. So if you wanted to find out what telephone
25    dialing equipment was used at a certain point in

Page 163

1    time by a vendor on USA Funds portfolio loan,
2    would you call the vendor?
3 A. Yes, I would.
4        MS. SIMONETTI: Okay. Nothing
5    further.
6        MR. LARRY: I have no further
7    questions.
8        MS. SIMONETTI: All right. He'll
9    sign.
10       (A discussion was held off the
11   record.)
12       MR. LARRY: So we have just conferred
13   off the record, and the witness will have 30 days
14   to review, sign, and submit any errata forms
15   related to the transcript of this deposition.
16   I'll take a pdf.
17       MS. SIMONETTI: Agreed, 30 days from
18   today.
19       MS. SIMONETTI: I'll take a copy.
20   Can my office call you with the order?
21       MR. LARRY: And I'd like it in five
22   business days.

Page 164

1 STATE OF INDIANA )
                  )SS:
2 COUNTY OF _____ )
3
4
5
6        I, the undersigned, declare under
7 penalty of perjury that I have read the foregoing
8 transcript, and I have made any corrections,
9 additions, or deletions that I was desirous of
10 making; that the foregoing is a true and correct
11 transcript of my testimony contained therein.
12
13       Executed this ____ day of _____, 20___,
14 at:
15
16
17
18       _____
19             MARK A. VERBRUGGE

**EXHIBIT 3 - PAGE 20**

**Page 165**

1 DEPONENT'S CHANGES OR CORRECTIONS
2 Note: If you are adding to your testimony, print
3 the exact words you want to add. If you are deleting
4 from your testimony, print the exact words you want
5 to delete. Specify with "Add" or "Delete" and sign
6 this form.
7
8 DEPOSITION OF:   MARK A. VERBRUGGE
9 CASE:          HENDERSON V. UNITED STUDENT AID FUNDS
10 DATE OF DEPOSITION: FEBRUARY 23, 2016
11
12 PAGE   LINE   CHANGE/ADD/DELETE
13 ___   ___   _____
14 ___   ___   _____
15 ___   ___   _____
16 ___   ___   _____
17 ___   ___   _____
18 ___   ___   _____
19 ___   ___   _____
20 ___   ___   _____
21 ___   ___   _____
22 ___   ___   _____
23 ___   ___   _____
24 ___   ___   _____
25 Deponent's Signature _____ Date _____

**Page 166**

1 PAGE   LINE   CHANGE/ADD/DELETE
2 ___   ___   _____
3 ___   ___   _____
4 ___   ___   _____
5 ___   ___   _____
6 ___   ___   _____
7 ___   ___   _____
8 ___   ___   _____
9 ___   ___   _____
10 ___   ___   _____
11 ___   ___   _____
12 ___   ___   _____
13 ___   ___   _____
14 ___   ___   _____
15 ___   ___   _____
16 ___   ___   _____
17 ___   ___   _____
18 ___   ___   _____
19 ___   ___   _____
20 ___   ___   _____
21 ___   ___   _____
22 ___   ___   _____
23 ___   ___   _____
24 ___   ___   _____
25 Deponent's Signature _____ Date _____

**Page 167**

1        REPORTER'S CERTIFICATE
2
3    I, LINDA C. CALLAHAN, a Court Reporter and
  Notary Public, certify;
4
     That the foregoing proceedings were taken
5 before me at the time and place therein set forth,
  at which time, the witness was put under oath by
6 me;
7    That the testimony of the witness, the
  questions propounded, and all objections and
8 statements made at the time of the examination
  were recorded stenographically by me and were
9 thereafter transcribed;
10   That the foregoing is a true and correct
  transcript of my shorthand notes so taken.
11
     I further certify that I am not a relative or
12 employee of any attorney of the parties, nor
  financially interested in the action.
13
     I declare under penalty of perjury under the
14 laws of Indiana that the foregoing is true and
  correct.
15
     Dated this 29th day of February, 2016.
16
17
18       _____
19
         LINDA C. CALLAHAN
20
21
22 My county of residence:  Hamilton
   My commission expires:  11/3/16
23
24
25

```
 1  STATE OF INDIANA    )
                        )SS:
 2  COUNTY OF _____   )

 3

 4

 5

 6            I, the undersigned, declare under
 7  penalty of perjury that I have read the foregoing
 8  transcript, and I have made any corrections,
 9  additions, or deletions that I was desirous of
10  making; that the foregoing is a true and correct
11  transcript of my testimony contained therein.
12
13            Executed this  28  day of  MARCH   , 2016,
14  at:
15
16
17
18            _____
19                    MARK A. VERBRUGGE
20
21
22
23
24
25
```

```
 1              DEPONENT'S CHANGES OR CORRECTIONS
 2     Note:  If you are adding to your testimony, print
 3     the exact words you want to add.  If you are deleting
 4     from your testimony, print the exact words you want
 5     to delete.  Specify with "Add" or "Delete" and sign
 6     this form.
 7
 8     DEPOSITION OF:          MARK A. VERBRUGGE
 9     CASE:                   HENDERSON V. UNITED STUDENT AID FUNDS
10     DATE OF DEPOSITION:     FEBRUARY 23, 2016
11
12     PAGE      LINE      CHANGE/ADD/DELETE
13      4         10       Change Middle Name Allen to Alan-
14      15        11       Change Agents to Agency
15      21         5       Change Williams to Windham.
16      49        11       Physical to Will
17      49        16       Venture to Vendor-
18      54        15       Wyndham to Windham.
19      96        15       in--- to NSI
20     110        20       Windom to Windham.
21     111         3       Windom to Windham.
22     152         4       Trend TO TRAN = TRANSACTION-
23     152         5       Trend TO TRAN
24
25     Deponent's Signature  [signature]        Date 5/28/16
```

```
1                REPORTER'S CERTIFICATE
2

3        I, LINDA C. CALLAHAN, a Court Reporter and
    Notary Public, certify;
4
         That the foregoing proceedings were taken
5   before me at the time and place therein set forth,
    at which time, the witness was put under oath by
6   me;

7        That the testimony of the witness, the
    questions propounded, and all objections and
8   statements made at the time of the examination
    were recorded stenographically by me and were
9   thereafter transcribed;

10       That the foregoing is a true and correct
    transcript of my shorthand notes so taken.
11
         I further certify that I am not a relative or
12  employee of any attorney of the parties, nor
    financially interested in the action.
13
         I declare under penalty of perjury under the
14  laws of Indiana that the foregoing is true and
    correct.
15
         Dated this 29th day of February, 2016.
16

17

18              _____
19                   LINDA C. CALLAHAN
20

21

22  My county of residence:  Hamilton
    My commission expires:   11/3/16
23

24

25
```