**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHYRIAA HENDERSON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STUDENT AID FUNDS, INC. D/B/A USA FUNDS,<br><br>Defendant. | CASE NO. 3:13-cv-1845-JLS-BLM<br>CLASS ACTION<br><br>**DELCARATION OF JEFFREY A. HANSEN**<br><br>Hearing date: July 7, 2016 2016<br>Time: 1:30 pm<br>Courtroom: 4A – 4th Floor |

## DECLARATION OF JEFFREY A. HANSEN

1. My name is Jeffrey A. Hansen. I am an adult over the age of 18, a resident of the state of California, and I reside at 2625 Kings View Circle, Spring Valley, CA 91977. Unless indicated otherwise, I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

2. I was asked to prepare this declaration by Plaintiff's counsel in the above-captioned matter, Law Offices of Ronald A. Marron, APLC and Edelson PC, in support of Class Certification.

3. I have been retained in this case at a rate of $300 per hour, for all services rendered, and $380 per hour for depositions.

***Experience and Credentials.***

4. I am the principal of Hansen Legal Technologies, Inc. My firm is in the business of handling Information Technology, including investigations and analysis of electronic data. I have served as an expert or consultant in more than 150 TCPA class action lawsuits, and as an expert or consultant in numerous other civil cases.

5. With regard to my experience as an expert and consultant in legal matters, generally, I have frequently served as an expert witness and consultant to law firms in conducting computer forensic analysis. I have also assisted in electronic discovery issues.

6. Specific to this case, my firm was retained to assist Plaintiff in evaluating and analyzing the telephone dialing systems used by agents for defendant United Student Aid Funds, Inc. ("USAF") in placing telephone calls to Plaintiff and the putative class. I have also been retained to assist Plaintiff and her counsel in evaluating and analyzing electronic data related to the calls and other electronic data associated with computer systems and/or telephone dialing systems used by USAF. In that respect, I have extensive experience with data warehousing, including data warehousing related to telemarketing and autodialers in general. I am familiar with the procedures involved in such practices, and I have personally engaged in data warehousing regarding the

compilation of certain lists, including demographic and target audience lists for telemarketing, and have personally repaired defective lists to eliminate improperly formatted and corrupted data.

7. I also frequently act as a consultant to companies that engage in the use of autodialers, and I am familiar with their use and procedures, and the technical aspects of that business. In that capacity, I have assembled, configured, maintained, operated all aspects of autodialers, and interfaced with the telecommunications providers through whose networks the autodialers operate.

8. I have set up and maintained all aspects of predictive dialers and autodialers, from predictive dialers operating with just three telephone lines to outbound call centers capable of generating over 1 million calls per hour. When building these systems, I have used various software and hardware solutions for predictive and autodialers, both proprietary and open source, and customized those systems for their particular uses. I myself have used and maintained predictive and autodialers, and trained others to do the same.

9. Further, I am familiar with the manner in which outbound dial lists are used and maintained in the debt collection industry in which USAF operates. Similarly, I am familiar and have experience with, and know how to use, databases containing cell block identifiers and ported number lists, both of which identify cellular type telephone numbers and are typically used in these industries.

10. Over the last twenty-six (26) years, I have also had extensive experience in a broad range of other areas in the electronic and information technology fields and obtained many certifications such as MCP 4.0, A+, Network+, MCP 2000, MCSA, MCSE, Linux+, I-Net+, Security+, CIW Security Analyst.  From the hardware perspective, I have extensive experience in troubleshooting and repairing at the component level, and building various systems for various purposes. I have designed, built and maintained computer networks in a variety of environments from commercial

businesses to very large DoD networks. I have taught approximately 1,000 others the skills to become computer network engineers themselves.

11. I have had extensive experience in dealing with security breaches and hardening computer networks against those breaches. I have handled many computer forensic and E-Discovery matters, including internal investigations in companies, working at the FBI sponsored Regional Computer Forensics Laboratory, and founding a computer forensics and E-Discovery firm over 8 years ago. I have also had extensive experience with the set-up and use of predictive and auto dialers. (See Exhibit A – Resume of Jeffrey A. Hansen).

12. I have been called to testify in the following civil matters: *Craig Casey v. Valley Center Insurance Agency Inc.*, Case No. 37-2008-00004378-SC-SC-CTL (San Diego Superior Court); *Stemple v. QC Holdings, Inc.*, Case No. 12-CV-1997-CAB-WVG (S.D. Cal.); *Hahn v. Massage Envy Franchising*, Case No: 3:12-cv-00153-DMS-BGS (S.D. Cal.), *Abdeljalil v. General Electric Capital Corporation*, Case No: 12-cv-02078-JAH-MDD (S.D. Cal.), *Jasminda Webb v. Healthcare Revenue Recovery Group, LLC* Case No: C 13-0737 JD (N.D. Cal.), *Balschmiter v TD Auto Finance, LLC,* Case No: 2:13-cv-01186 (E.D. Wisc.), *Jordan Marks v Crunch San Diego, LLC,* Case No. 14-CV-0348-BAS (BLM) (S.D.Cal.), *Peter Olney v Job.com,* Case No: 1:12-cv-01724-LJO-SKO (E.D. Cal.), *Carlos Guarisma v ADCAHB Medical Coverages, Inc. and Blue Cross and Blue Shield of Florida, Inc.*, Case No: 1:13-cv-21016-JLK (S.D. Fla.), *Farid Mashiri v Ocwen Loan Servicing, LLC,* Case No: 3:12-cv-02838 (S.D. Cal.), *Monty J. Booth, Attorney at Law, P.S. v Appstack, Inc.*, Case No. 2:13-cv-01533-JLR (W.D. Wash.), *Rinky Dink, Inc. d/b/a Pet Stop v World Business Lenders, LLC,* Case No. 2:14-cv-00268-JCC (W.D. Wash.), *Michael Reid and Dave Vacarro v. I.C. Sytems, Inc.*, Case No. 2:12-cv-02661-ROS (D. Ariz.), *Jeffrey Molnar v NCO Financial Systems* Case No. 3:13-cv-00131-BAS-JLB (S.D. Cal.), *Latonya Simms v Simply Fashion Stores LTD, and ExactTarget, Inc.*, Case No. 1:14-CV-00737-WTL-DKL (D. Ind.), *Sueann Swaney v Regions Bank,* Case No. CV-13-RRA-0544-S (N.D. Ala.); *Hooker v SiriusXM,* Case

1  No. 4:13-cv-00003 (AWA) (E.D. Va.), *Diana Mey v Frontier Communications,* Case
2  No. 13-cv-01191-RNC (D. Conn.), *Rachel Johnson v Yahoo! Zenaida Calderin v Yahoo!*
3  *Case* No. 14-cv-2028 14-cv-2753 (N.D. IL), *Philip Charvat v Elizabeth Valente,* Case
4  No. 12-cv-5746 (N.D. IL), *Robert Zani v Rite Aid Hdqtrs. Corp.*, Case No. 14-cv-
5  9701(AJN)(RLE)(S.D. NY).

6        13.    I have reviewed various documents and evidence from this case relating to
7  the calls made to Plaintiff and the proposed Class, and I have reviewed various other
8  documents relating to the use and regulation of autodialers. Specifically, I have
9  reviewed the following documents: 1) Exhibit B - The Big 2 Myths You Probably
10 Believe About Manual Dialing - Part 1; 2) Exhibit C - The Big 2 Myths You Probably
11 Believe About Manual Dialing - Part 2;  3) Exhibit D - US patent 3,943,289; 4) Exhibit
12 E - US patent 4,933,964;  5) Exhibit F - Noble TCPA Compliance Solution; 6) Exhibit
13 G - ATDS and predictive dialers 1970-1992;  7) Exhibit H - Davox Marketing; 8)
14 Exhibit I - US Patent 3229042;  9) Exhibit J - US Patent 3317678;  10) Exhibit K -
15 IMS_Do_Not_Contact_Solutions;  11)  Exhibit L - About_IMS;  12) Exhibit M -
16 IMSCustomerList; 13) Exhibit N – wireless-block-identifier;  14) Exhibit O - NPAC.

17       14.    Additionally, I have been in receipt and have reviewed documents
18 provided to me by Plaintiff's counsel produced in response to subpoenas served on
19 General Revenue Corporation ("GRC"), National Enterprise Systems, Inc. ("NES"),
20 Pioneer Credit Recovery, Inc. ("Pioneer"), Allied Interstate LLC ("Allied"), Coast
21 Professionals, Inc. ("Coast"), Delta Management Associates, Inc. ("Delta"), Enhanced
22 Recovery Company, LLC ("ERC"), Enterprise Recovery Systems, Inc. ("ERS"),
23 Collecto, Inc. ("EOS USA"), Financial Management Systems, Inc. ("FMS"), Valentine
24 & Kebartas, Inc. ("V&K"), West Asset Management, Inc. ("West") and Windham
25 Professionals, Inc. ("Windham") (together referred to as "Collectors").  I am informed
26 that the information I have reviewed respond to Plaintiff's request to the Collectors to
27 produce information relating to the telephone dialing equipment used to make phone
28

calls on behalf of USAF for the purpose of collecting on USAF's accounts from August 8, 2009 to the present.  The information includes:

    a. documents regarding Livevox, Inc.'s ("Livevox") predictive dialing system produced by Allied (PL-3PARTY PRODUCTION005648-6027), Delta (PL-3PARTY PRODUCTION006485-6533), ERC (PL-3PARTY PRODUCTION006612-6688), ERS (PL-3PARTY PRODUCTION006694-6941, 9089-9097), EOS USA (PL-3PARTY PRODUCTION010058-10437), V&K (PL-3PARTY PRODUCTION019473-19477) and Windham (PL-3PARTY PRODUCTION019347-19386);

    b. documents regarding the Ontario Systems' Guaranteed Contacts predictive dialing system produced by GRC (NSI-GRC 27-111), NES (PL-3PARTY PRODUCTION000151-1976) and West (USAF-3PARTY PRODUCTION0000001-12);

    c. documents regarding Ontario Systems' Contact Savvy predictive dialing system produced by Coast (PL-3PARTY PRODUCTION006238-6320);

    d. documents regarding Noble Systems' predictive dialing system produced by Pioneer (NSI-PCR000122-1207);

    e. documents regarding aQrate's predictive dialing system produced by Allied (PL-3PARTY PRODUCTION006028-6083);

    f. documents regarding DAKCS Qwikdial predictive dialing system produced by Delta (PL-3PARTY PRODUCTION006534-6549);

    g. documents regarding Genesys Soundbite predictive dialing system produced by EOS USA (PL-3PARTY PRODUCTION010008-10057);

    h. documents regarding DPTS system produced by FMS (PL-3PARTY PRODUCTION019592-19687);

    i. documents regarding Interactive Intelligence's predictive dialing system produced by Pioneer and GRC (produced jointly as NSI-GRC-PCR000002-2143).

15. Additionally, I have analyzed the Ontario Systems Guaranteed Contacts predictive dialer, Ontario Systems Contact Savvy predictive dialer, LiveVox, Inc. predictive dialer, Genesys/Soundbite predictive dialer, Noble Systems predictive dialer, Interactive Intelligence predictive dialer, and aQrate predictive dialer in other matters.

16. Based upon the documents and evidence I have reviewed, I conclude that each of the dialers used to call Plaintiff and the members of the proposed Class is a predictive dialer, and therefore an Automatic Telephone Dialing System under the TCPA.

17. Further, based upon the documents and evidence I have reviewed, I conclude that USAF's collections agents have used predictive dialers to call millions of unique cellular telephone numbers.

### *USA Funds used Predictive Dialers, which have the Characteristics of an Automatic Telephone Dialing System*

18. I have been retained in part to evaluate whether the telephone dialing systems used by USAF to place the calls at issue in this case are predictive dialers or otherwise have the characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act, 47 U.S.C. § 227. ("TCPA"). According to the FCC:

> The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system,' the equipment need only have 'the *capacity* to store or produce telephone numbers (emphasis added)'"….

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, ¶¶ 131–134 (2003) (the "2003 Order).

19. The term "predictive dialer" is a technical term used to describe the type of dialing system. Predictive dialers all work under the same guiding principle: they

7

transfer telephone numbers to be called to a list or "campaign." This list of numbers is then dialed without human intervention. The calls are made, using multiple telephone lines, in advance of being connected to a live operator. Using a complex computer algorithm, the dialing system will "predict" how far in advance to make the calls in attempt to prevent time wasted in listening to rings, answering machines, disconnected phone numbers and calls that are not answered. This functionality has not changed materially since Davox marketed their predictive dialers in the 1980's. (*See Exhibit H - Davox Marketing*).

20. The term "predictive dialer" was not created by the FCC in their 2003 Order. Nor was the term "automatic telephone dialing system" created by Congress. These are terms that have been used to describe such equipment, by those in the industry for decades. Norman A. Sheldon filed a patent (*Exhibit D - US patent 3,943,289*) on July 12, 1974 for what he called a "automatic telephone dialing system" (*id.*, *page 4*, *column 2*, *line 63*) which dialed numbers from a sequential number generator and delivered pre-recorded messages to telephone subscribers. He chose to use a sequential number generator because at that time computer storage was very expensive (*id.*, *page 4*, *column 2*, *lines 2–11*.) Although he chose to use a sequential number generator, stored lists of numbers had been used for many years prior to his patent. (*See Exhibit I - US Patent 3229042; Exhibit J - US Patent 3317678*). In July 25, 1989, Bassem M. Girgis filed a patent (*Exhibit E - US patent 4,933,964*) for a "predictive outbound dialing system" (*Exhibit E - US patent 4,933,964 page 19 column 2 line 53*) which used an "input call list" (*Exhibit E - US patent 4,933,964 figure 3*) stored in the system to call those numbers in advance predicting when a live agent would be available using a predictive algorithm. This system was designed to call out on more lines than available agents from a list of numbers, listen for rings, busy, and answered calls, and connect the calls to agents by predicting when they would be available. This is the precise capability of the predictive dialers used today and the predictive dialers used by USA Funds. The functionality of the autodialers and

predictive dialers has not changed materially from long before the TCPA until now with the exception that modern dialers can make more calls in a shorter period of time. Attached as *Exhibit G* are examples of articles and job postings illustrating that the exact same type of equipment was used over the last four decades, along with the terms "Automatic Telephone Dialing System" and "Predictive Dialer," long before Congress or the FCC considered the equipment.  (*See Exhibit G - ATDS and predictive dialers 1970-1992*; *see also* Brief for Respondents, *ACA Int'l. et al. v. Fed. Commc'ns. Comm.*, No. 15-1211, Dkt. No. 1594039, at *13–14 n.3 (D.C. Cir. Jan. 15, 2016) (hereinafter "FCC Resp. Br."). The equipment described in the TCPA and the FCC 2003 Order have precisely the same characteristics as the equipment that is in use today and used by USA Funds.The fact that the dialers place calls to numbers stored by the dialing system and deliver predictive dialed calls indicates tht the dialers have the characteristics of an ATDS, as it relates to predictive dialers as clarified in the FCC 2003 Order:

> The record demonstrates that a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers.  As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.  The principal feature of predictive dialing software is a timing function, not number storage or generation. ...[T]hese machines are not conceptually different from dialing machines without the predictive computer program attached."
>
> ….
>
> The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need

only have the "capacity to store or produce telephone numbers (emphasis added). . .." It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. The basic function of such equipment, however, has not changed—the capacity to dial numbers without human intervention. We fully expect automated dialing technology to continue to develop.

….

[T]o exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result. ...We believe the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialed calls not be circumvented. Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress.

(2003 Order, at ¶¶ 131-134).

21.   All predictive dialers have the characteristics of an ATDS, but not all ATDS's are predictive dialers.  As the FCC stated, "The principal feature of predictive dialing software is a timing function, not number storage or generation.... [T]hese machines are not conceptually different from dialing machines without the predictive computer program attached." (*See id.*, ¶ 131).  That is, all predictive dialers necessarily have the capacity to store and automatically call lists of telephone numbers, in addition to their predictive functionality (which some ATDS's lack).

22.   The dialer's mode of operation for a given call or campaign does not alter its capacity as an ATDS.  Changing the mode of dialing is effectively done by a couple of mouse clicks and clicking "save."  The FCC considered this when clarifying

"capacity." (FCC Resp. Br. at 31–36). The administrator of a predictive dialer is not capable of removing the functionality of the system; The administrator can only choose to not use it. The fact that one campaign can be configured to use preview mode and another campaign configured to use predictive, while other agents place calls manually, all occurring at the same time, illustrates the systems have the current capacity regardless of the dialing mode selected for a particular campaign.

23. All Predictive Dialers that I have seen also employ a "manual" mode and a "preview" mode, which presents the calling agent with information about the to-be-called party before the number is actually dialed. The agent then has the ability to accept that lead based on the information presented, or reject it and await the dialer to present a new lead to be called. Because a dialer has a preview mode or a manual mode and the calling party may have used those modes, however, does not mean that the dialer fails to qualify as an ATDS.

24. I am not alone in my understanding of whether manual mode has any effect on the capacity of the predictive dialer. Recently, Ontario Systems (the creators of the popular Guaranteed Contacts predictive dialer and the FACS system) published a two-part article on the subject of dialing modes and their impact on the predictive dialer's capacity as defined by the FCC. Using the example of manually dialed calls through the predictive dialer, Ontario Systems highlights that a Predictive dialer is a predictive dialer regardless how it is used. Manual dialing occurs when one presses all ten digits of the phone number to place the call, not a number stored on the list. Preview mode calls the numbers from the list stored in the predictive dialer's database. The FCC clarified that predictive dialers are an ATDS because of their capacity, not how the operator uses it. The industry has named the predictive dialer not based on how one uses it, but by its capabilities. The two articles from Ontario Systems are relevant in their entirety (*See Exhibit B - The Big 2 Myths You Probably Believe About Manual Dialing - Part 1*; *Exhibit C - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2*), however, the summary highlights the main point:

> In other words, if the technology you use to contact consumers has any capacity to dial predictively, or pull from a database of numbers and dial them, current judicial opinion indicates it is an autodialer. Period. This is true whether you launch the call manually by pressing a field, or if you enter 10 digits on a keypad. On the other hand, it opined such a call is a manual dial if it's made using a system to contact consumers that is not tied, routed from or to, or in any way connected to your autodialer. If it's not, it is unlikely you are contacting consumers using an automatic telephone dialing system as defined by the FCC.

(*Exhibit C - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2*). In other words, to call cell phones, one should use a separate PBX phone system entirely (plain phone system).

25. Another manufacturer of a popular predictive dialer agrees. Noble Systems offers a solution which routes calls to wireless numbers through a separate PBX entirely. (*See Exhibit F - Noble TCPA Compliance Solution*).

26. As stated above, the FCC relies upon the following definition of an "automatic telephone dialing system":

> The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have "the capacity to store or produce telephone numbers (emphasis added)…."

(*See* 2003 Order, at ¶ 132). Even more recently, on July 10, 2015, the FCC issued a Declaratory Ruling and Order in which the FCC clarified the term "capacity." (*See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, at ¶¶ 10–24 (2015) (hereinafter the "2015 Order").

27. The FCC's orders and rulings provide me with information that assists me in forming an opinion about whether USAF's dialing systems have the characteristics of

an ATDS. Based on those orders and rulings, based upon my review of the documents and evidence provided in this case, based on my knowledge of computer storage and computer processing, and based on my knowledge of autodialers and predictive dialers, it is also my expert opinion that the calls at issue, placed by USAF to Plaintiff and the proposed Class were made using predictive dialers that have the characteristics of an automatic telephone dialing system as defined by the TCPA and FCC.

28. Analyzing the predictive dialers used was a simple process. To satisfy the question of whether or not the systems have the technical capabilities described in the FCC's clarification of the TCPA in the 2003 report, all I had to do was investigate what the dialing equipment is capable of doing, and using my knowledge of predictive dialers, determine if in fact those capabilities are those defined in the 2003 FCC Order.

29. After studying the documents produced by the Collectors for each of the dialers implicated by Plaintiff's proposed Class definition—*i.e.*, those from Livevox, Inc., Ontario Systems Guaranteed Contacts, Ontario Systems Contact Savvy, Noble Systems, aQrate, DAKCS Qwikdial, Genesys Soundbite, the DPTS system, and Interactive Intelligence—and based on my own experience with predictive dialers, I had far more knowledge than what was required to make an informed and reliable determination of whether or not the systems at issue in this case are able to store numbers and call them automatically, or whether the systems can generate numbers and call them automatically. In the case of the predictive dialers used by USAF, the systems are capable of doing both.

30. In this case, the predictive dialers used by USAF have the capacity to store numbers in a database, generate numbers for inclusion in a calling list, and call those numbers without human intervention. Even if the operator of the computer walks away, the dialers would continue to make those calls; and it will continue to make those calls until the list of phone numbers is exhausted.

31. Each dialer listed above can call lists of numbers organized as "campaigns." Each can launch predictive-dialed agent calls or deliver pre-recorded

messages by automatically calling a list of numbers (a "campaign" or "pool"[1]), and either connecting to agents as available, or playing a pre-recorded or automated audio file.

32. For predictive-dialed calls, these dialers will call using multiple telephone lines per agent, and will use all available telephone lines when making agent-less calls. All phone calls, regardless of how dialed are called using the same equipment, terminals, phone, PBX, and dialer before going to the PSTN (public switched telephone network).

33. Additionally, the properties of the dialing systems have the precise capabilities of an ATDS as further clarified by FCC Order 12-56 (May 21, 2012), wherein, the FCC stated:

> Under the TCPA, the term "automatic telephone dialing system" is defined as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id*. at § 227(a)(1). The Commission has emphasized that this definition covers any equipment that has the specified capacity to generate numbers and dial them without human intervention whether or not the numbers called are randomly or sequentially generated or come from calling lists.

2003 Order, at ¶ 133.

34. Thus, in my expert opinion, the dialing systems (as outlined above) have the characteristics of an ATDS as contemplated by the TCPA and clarified by the FCC, because the systems have the capacity to store numbers in a list and dial them without human intervention and also have the capacity to generate numbers from a list for dialing without human intervention.[2]

---

[1] A "pool" is, like a "campaign," in that it is calling a list of phone numbers organized by some predefined criteria for a specific purpose.

[2] In light of the FCC's July 10, 2015 Declaratory Ruling and Order where it takes a broad definition of "capacity" as it relates to autodialing numbers and the generation of numbers, I would point out that making a computer generate a list of 10 digit numbers "out of thin air", is a relatively trivial task. Computers are designed to do math and counting i.e. "to compute." For example, typing "seq 6192486000 6192486999 >

***Work and Analysis in this Case Regarding Calls Made by USAF's Collectors***

35.  In this case, I was also asked to compare or "scrub" the call records produced by USAF and third parties against two telephone number databases widely used by the telecommunications industry to identify the telephone numbers that are assigned to cell phones, and identify whether the telephone numbers assigned to cell numbers have been previously or subsequently reassigned or "ported" to or from landlines.

36.  I am familiar with the databases used to determine whether a particular telephone number is a assigned to a cell phone, and determine whether the number was ever reassigned from a landline to a cell phone or vice versa, because I personally use them on a regular basis. I have personally compared lists of telephone numbers against these same databases to identify which numbers are cell phones, and whether and when numbers had been reassigned from landline to cell phone or vice versa, on countless occasions over the years.

37.  The database I regularly use and rely on in my business to determine if a telephone number has been assigned to a cell phone is the Interactive Marketing Solutions or "IMS" wireless cell block identifier list. This list was compiled by Interactive Marketing Solutions and the Direct Marketing Association. (*See Exhibit M* -

---

sequential_numbers_to_call.txt" creates a list of 1000 Sprint Wireless Numbers to be called (this was done on my regular laptop with no additional software installed.  In other words, my laptop running Linux has natively installed a "sequential number generator" that can produce a list of phone numbers.  Windows computers have a similar command line function as well.  Typing "for /L %i in (2480000,1,2489999) do @echo 619%i >> sequential_numbers_to_call.txt" generates the same list on a Windows computer.  All the predictive dialers used by USA Funds run on Linux or Windows and therefore have sequential number generators.  Of course, storage of numbers does not discriminate on how the numbers were produced as computer storage can store any kind of data regardless of how it was produced whether loaded from a list of known numbers or a list of sequentially generated numbers. (*See* FCC Resp. Br. at 6, 12–13, 36–49, 52.)

*IMS_Do_Not_Contact_Solutions; Exhibit L – About IMS; Exhibit K – IMS Customer List; Exhibit N – wireless block identifier*).

38.     The FCC's Enforcement Bureau, Telecommunications Consumers Division ("TCD") has relied on the IMS database, which the FCC has described as "an industry standard, commercially available database of known assigned and ported wireless numbers…" FCC 14-59, 29 FCC Rcd 5537, ¶7 n.16 (May 8, 2014) ("TCD compared the call records to an industry-standard, commercially available database of known assigned and ported wireless numbers to determine whether the Company made robocalls to wireless telephones. See Interactive Marketing Solutions, Inc. Website, http://www.ims-dm.com/index.shtml"); see also DA 13-265, 28 FCC Rcd 1840, ¶ 9 and n. 25 (Mar. 15, 2013), citing Interactive Marketing Solutions, Inc. Website http://www.ims-dm.com/index.shtml); and DA 15-530, 30 FCC Rcd 4548, ¶ 7 and n. 24 (May 4, 2015), citing Interactive Marketing Solutions, Inc. Website Homepage http://www.ims-dm.com/mvc/index.php.

39.     The database I regularly use and rely on in my business to determine whether a cell phone number has been reassigned or "ported" to or from a landline is the Neustar ported-to-wireless list and ported-to-landline list. Neustar is the ultimate resource of these lists because it was selected by the FCC to be the administrator of the Number Portability Administration Center (NPAC), the telecommunication industry's common, authoritative database for routing calls for numbers ported between landline and wireless. (*See Exhibit O - NPAC*). The FCC also appointed Neustar as the North American Numbering Plan Administrator, which is responsible for the U.S. telephone numbering system. *See* 2003 Order at ¶170 ("NeuStar as the North American Numbering Plan Administrator, the National Pooling Administrator, and the LNP Administrator makes information available that can assist telemarketers in identifying numbers assigned to wireless carriers.")

40.     ACA International, the Association of Credit and Collections Professionals, lists both Interactive Marketing Solutions and Neustar as "industry

vendors that provide cell phone scrubbing services." (www.acainternational.org/tcpaarticle-cell-phone-scrubbing-services-36882.aspx (last visited May 4, 2016)).

*Analysis of Call Records*

41. I have received several CSV files containing call detail records provided by Plaintiff's counsel that I understand to document the phone calls made by the Collectors on behalf of USAF for the purpose of collecting on USAF's accounts, from August 8, 2009 to the present. While the analysis of those Call Detail Records is still ongoing, I have already identified several millions of calls to wireless numbers.

42. To determine which telephone numbers listed on the spreadsheets were cell phone numbers *as of the date of the calls* indicated in the records, I first compared all of the telephone numbers listed in them against the numbers listed in the IMS database. This involved simply copying the spreadsheets and the IMS wireless cell block identifier list into a conventional database program, and then executing a basic command telling the program to compare the two lists to identify matches. This comparison could be performed manually (by simply looking at the two lists), but that would take an exceptionally long period of time given the size of the lists.

43. Then I compared the list of phone numbers in the spreadsheets to the list of phone numbers in the Neustar database to see which ones had been reassigned from landline to cell or from cell to landline. This involved the same process described above. I copied the Neustar ported number lists into a relational database with Defendant's spreadsheets and executed a basic command telling the program to compare the lists to identify the matches, and simultaneously identify which of the numbers that were reassigned were nevertheless wireless numbers at the time of the call. The lists included a date field showing when each number was reassigned or ported, if at all. This comparison also could be performed manually (by simply looking at the two lists), but once again that would take an exceptionally long period of time given the size of the lists.

44. In my analysis, I was able to identify that just seven of the thirteen Collectors have combined to place 11,194,266 calls to wireless numbers.

45. My analysis of the Call Detail Records is still ongoing, and the final analysis will identify all phone calls made to landline and wireless numbers, as well as each of the unique wireless phone numbers called.

46. I reserve the right to amend, modify or supplement the statements and opinions set forth herein as appropriate.

*         *         *

I declare that the foregoing is true and correct, subject to the laws of perjury of the United States. Executed in Spring Valley, CA on this 4th day of May, 2016.

_____
Jeffrey A. Hansen