UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHYRIAA HENDERSON,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STUDENT AID FUNDS, INC.,<br><br>Defendant. | Case No.: 13cv1845 JLS (BLM)<br><br>**ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING AS MOOT (2) PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION AND (3) DEFENDANT'S MOTION TO STRIKE**<br><br>(ECF Nos. 142, 158, 173) |

Presently before the Court is Defendant United Student Aid Funds' Motion for Summary Judgment ("MSJ"), (ECF Nos. 173, 183); Plaintiff Shyriaa Henderson's Opposition to Defendant's Motion for Summary Judgment ("Opp'n"), (ECF Nos. 210, 212), and Defendant's Reply in Support of Motion for Summary Judgment ("Reply"), (ECF Nos. 219, 221). Also before the Court are Plaintiff's Renewed Motion for Class Certification, (ECF No. 142), and Defendant's Motion to Strike, (ECF No. 158). Having considered the parties' arguments and the law, the Court **GRANTS** Defendant's Motion for Summary Judgment, and therefore **DENIES AS MOOT** Plaintiff's Renewed Motion for Class Certification and Defendant's Motion to Strike.

# BACKGROUND

## I. Factual and Procedural Background

Plaintiff first took out a student loan in January of 1993. (Opp'n 7.) The loan became delinquent in 2002, entered into default in 2003, and was rehabilitated in 2004. (*Id.*) Plaintiff took out a second student loan in 2007 on which she later defaulted. (*Id.*) Plaintiff currently owes $6,100 across both loans.

Defendant was the guaranty agency for Plaintiff's loans, and purchased the claims to the defaulted loans in 2010. (*Id.*) Defendant hired Navient Solutions, Inc. ("NSI") to service and collect on the defaulted loans, and Plaintiff subsequently received "a number of unsolicited phone calls, featuring artificial or prerecorded voices, to her wireless phone" attempting to collect on the defaulted loans. (*Id.*) Plaintiff never gave Defendant or any relevant entity prior express consent to call her cellular telephone with the use of an autodialer or prerecorded message. (*Id.*)

Plaintiff filed suit against Defendant on August 8, 2013 in the form of a putative class action for damages and injunctive relief under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227 *et seq.* (ECF No. 1.) Plaintiff subsequently amended her complaint, adding Defendants NSI and several collectors who contracted with NSI. (ECF No. 47.) Several months later, the newly added Defendants were dismissed for lack of jurisdiction. (ECF No. 81.) Discovery proceeded for over a year, at which point Plaintiff filed the currently pending Motion for Class Certification, (ECF No. 142), and Defendant filed the currently pending Motion for Summary Judgment, (ECF Nos. 173, 183). The parties jointly moved for one, consolidated hearing date for both motions, (ECF No. 180), which the Court granted, (ECF No. 181).

## II. Defendant's Relationship with NSI and the Collectors

Defendant is a non-profit guaranty agency working in the Federal Family Education Loan Program ("FFELP"). (Tharp Dep. 12:5–7, ECF No. 210-3.) Consistent with FFELP regulations, Defendant contracts with NSI for loan servicing work. (Tharp Dep. 15:8–11; Verbrugge Dep. 15:6–16, ECF No. 210-4.) The agreement between Defendant and NSI

states that the parties will act "in independent capacities and not as agents[,]" (Tharp Dep. Ex. 2, Fifth Restated and Amended Guarantee Services Agreement for United Student Aid Funds, Inc. ("Service Agreement") art. III.A.1, ECF No. 183-3), and to that end permits NSI to hire subcontractors (the "Collectors") independent of any objections or recommendations Defendant might have, (*id.* art. III.A–B; *id.* Ex. A, ¶ 5). This includes NSI's ability to terminate Collectors, an ability the Service Agreement does not explicitly provide to Defendant, and an action Defendant has never taken. (*See id.* art. III.B; Tharp Dep. 65:16–70:16.)

The Service Agreement also provides Defendant the right to audit any Collector and to view copies of the Collector's agreements with NSI. (*Id.* art. III.B.) Defendant forwards any consumer complaints it receives regarding NSI Collectors on to NSI, (Tharp Dep. 49:7–11, 138:11–17), pursuant to Defendant's internal guidelines, (*see id.* 100:3–21), and Defendant's and NSI's contractual relationship, (*see* Service Agreement art. III.B). Additionally, "[a]t least quarterly" NSI has to provide to Defendant "[p]erformance data for the entire USA Funds portfolio of defaulted Loans and for each collection vendor, including collection vendor performance rankings[,]" and "[a] written report on borrower litigation relating to Loans . . . ." (*Id.* art. III.M.) Finally, Defendant requires "all collection vendors on first placements of defaulted Loans [to] be within 87% of the top performing collection agency on first placement of defaulted loans." (*Id.*)

Separate agreements between NSI and the various Collectors govern the relationships between NSI and the Collectors. As the NSI-Collector relationships relate to Defendant, "[o]nce the Collectors collect on a defaulted loan, they transfer the collected monies to NSI, which then remits the payment to USAF." (Opp'n 25.) "USAF, in return, pays NSI a monthly portfolio management fee for its role in servicing the loans and managing the Collectors." (*Id.*) Both the Service Agreement and the NSI-to-Collector agreements require absolute compliance with federal law. (Service Agreement art. II.A.2; Verbrugge Dep. Ex. 3, art. III.B.)

/ / /

# LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense. Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' " that show an absence of dispute regarding a material fact. *Id.* When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts' " that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-

moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

## ANALYSIS

Defendant moves for summary judgment on two grounds: (1) the Bipartisan Budget Amendment Act of 2015 created an exception to the TCPA which applies to Defendant in the present case, and (2) there is no basis here to impose vicarious liability on Defendant.[1] The Court addresses each argument in turn.

**I.   The TCPA, the Bipartisan Budget Amendment Act of 2015, and the Subsequent FCC Rulemaking**

Defendant argues that the loans which are the subject of Plaintiff's TCPA complaint constitute debt "owed to or guaranteed by the United States" such that they fall into a newly added exception to the general TCPA autodialer and artificial or prerecorded voice prohibitions. Plaintiff does not dispute that the new exception may be retroactively applied to the loans here at issue, but instead argues that the loans are merely insured by the United States and therefore do not fall within the newly added exception. The Court first sets the stage by outlining the historic contours of the TCPA, the recent exception to the same added by the Bipartisan Budget Act of 2015, and the August 2017 FCC Report and Order's construction of the recent exception. The Court then addresses the parties' arguments regarding the exception.

Prior to 2015, the TCPA flatly outlawed any call using an "automatic telephone dialing system or an artificial or prerecorded voice" unless such call was for "emergency purposes" or pursuant to "prior express consent." *See* 47 U.S.C. § 227(b)(1)(A)–(B) (2012). However, the Bipartisan Budget Act of 2015 ("Budget Act") loosened this prohibition by amending the TCPA with an exemption for any call "made solely to collect on a debt owed

---

[1] Plaintiff nowhere argues that Defendant directly violated the TCPA. (*Compare, e.g.*, First Am. Compl. ¶ 19, ECF No. 47 ("Defendant USA Funds did not make collection calls to Plaintiff."), *with, e.g.*, Def. United Student Aid Funds, Inc. d/b/a USA Funds' Answer to First Am. Compl. ¶ 19, ECF No. 49 ("USA Funds admits that it did not place any collection calls to Plaintiff.").)

to or guaranteed by the United States" ("Budget Act Amendment"). Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584 (2015); 47 U.S.C. § 227(b)(1)(A)(iii). Additionally, the Budget Act required the FCC to "prescribe regulations to implement the [Budget Act's] amendments" to the TCPA. Budget Act, 129 Stat. at 588.

On May 6, 2016 the FCC issued a Notice of Proposed Rulemaking regarding the relevant sections of the Budget Act, *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, FCC 16-57 (May 6, 2016), and several months later issued a Report and Order regarding the same ("FCC Order"), *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 31 F.C.C. Rcd. 9074 (2016) ("In this Report and Order . . . , we take steps to implement Section 301 of the Bipartisan Budget Act of 2015 . . . ."). Of particular relevance to the present case, the FCC Order construed the phrase "owed to or guaranteed by the United States" as including "only debts for which the United States is currently the owner or guarantor of the debt[,]" TCPA Report and Order, 31 F.C.C. Rcd. at 9082, to the exclusion of debts merely "insured by the United States[,]" *id.* at 9082, n.54. Although the FCC declined to "define or determine with particularity exactly which debts are included in or excluded from this phrase[,]" it noted that "definitions applicable to each specific federal program"—"and any agency or judicial interpretations of them"—constitute "highly relevant evidence regarding whether a debt is 'owed to or guaranteed by the United States.' " *Id.* at 9082–83.

In the present case, Plaintiff's loans were issued pursuant FFELP, and are therefore governed by Title 20, Chapter 28, Subchapter IV Part B of the United States Code. Section 1071 sets forth the purposes of the relevant code provisions, including "to pay a portion of the interest on loans to qualified students which are insured under this part," § 1071(1)(C), and "to guarantee a portion of each loan insured under a program of a State or of a nonprofit private institution or organization which meets the requirements of section 1078(a)(1)(B) of this title[,]" § 1071(1)(D). Section 1078(a)(1)(B)—in relevant part—triggers federal interest subsidies when a post-June 20, 1967 loan "was made by an eligible lender and is

insured under a program covered by an agreement made pursuant to subsection (b) of this section." Subsection (b) is activated when there a valid agreement between the Secretary of Education and "[a]ny State or any nonprofit private institution" pursuant to the Secretary's "determin[ation] that the student loan insurance program" meets any of several relevant criteria. § 1078(b)(1); *see also generally* § 1078(b)(1)(A)–(U).

Defendant argues that the statutory text governing the FFELP contains both a guarantee and insurance component which apply here, that Plaintiff makes too much of the FCC's Order, and that "no matter how [the government's] role is described, it is ultimately responsible for repayment of defaulted loans." (Reply 2.) Plaintiff counters that the particular word used to describe the FFELP parties' relationship does, in fact, matter, and that USAF itself has many times noted that it is "a non-profit guarantee agency working with federally insured student loans . . . ." (Opp'n 9 (quoting MSJ 1).) Ultimately, the Court agrees with Plaintiff.

As an initial matter, FCC final orders are not reviewable by this Court, and therefore are binding if they directly speak to a particular issue. *See Pac. Bell v. Pac W. Telecomm, Inc.*, 325 F.3d 1114, 1125 (9th Cir. 2003). And although Defendant makes much of the fact that Plaintiff's entire argument against applying the Budget Act Amendment to this case hinges on a single footnote, there is no reason a footnote cannot be outcome determinative of an issue. Further, Defendant's argument conspicuously avoids the underlying context of the FCC Rulemaking. The Budget Act Amendment required the FCC to "prescribe regulations to implement the amendments[,]" specifically including the newly minted exception for debts "owed to or guaranteed by the United States." FCC Order, 31 F.C.C. Rcd. at 9074–75. And in the FCC's Order it explicitly noted and accounted for the tension of "balanc[ing] the importance of collecting debt owed to the United States and the consumer protections inherent in the TCPA." *Id.* at 9075 (footnote omitted). In this, the FCC was quite clear: "The measures we adopt today implement Congress's mandate to ensure the TCPA does not thwart important calls that can help consumers avoid debt troubles while preserving consumers' ultimate right to determine what calls they wish to

receive." *Id.*[2] Accordingly, it is clear that the FCC was well aware of the potential for any of the various Order provisions to expand or contract TCPA liability, and the corresponding importance to both the public and the government of any such changes.

Despite this general backdrop, Defendant argues that the language in the FCC footnote declining to expand the scope of the Amendment to "insured" debts "is a statement that the issue was not examined at all." (Reply 4.) But this argument lacks support in either the text of the footnote or the balance of the FCC Order. *Id.* at 9083, n.54 ("We, therefore, determine that debts insured by the United States are not included in the language of the Budget Act amendments; only debts owed to or guaranteed by the United States are included in the language of the Budget Act amendments." (emphasis added)). *Compare id.*, *and id.* at 9083 ("We clarify that the debt must be currently owed to or guaranteed by the federal government at the time the call is made." (emphases original)), *with, e.g., id.* at 9080, n.43 ("Because we lack a developed record on the point, we do not formally define 'delinquent' or 'delinquency.'"). Accordingly, Defendant's argument here fails.

Defendant's final argument is that, "unlike the Budget Act Amendment itself," the "agency rule does not have retroactive effect" and therefore Defendant here falls within the Amendment's exception for purposes of this suit. (Reply 4.) Specifically, Defendant asserts that the Supreme Court's statutory retroactivity analysis set forth in *Landgraf v. USI Film*

---

[2] *See also id.* at 9078 ("Consumer response to the NPRM reflects the public's general dislike for robocalls and their desire for the Commission to provide them greater protection against unwanted calls. Over 15,700 individuals filed comments directly in the record. Over 12,500 of those comments expressed a general dislike for robocalls, while approximately 2,500 included more pointed comments regarding debt collection and calls by the federal government. In addition to the 15,700 individual comments, Consumer's Union submitted a petition containing 4,800 signatures asking the FCC to stop robocalls to cellphones and Americans for Financial Reform submitted a petition containing 5,346 comments from members in support of the FCC's proposed limitations on calls. Commenters also report consumers' fear of scam robocalls, fear for their safety when receiving robocalls while driving, and fear that robocalls impact the physical and mental health of senior adults. One commenter states that because the Budget Act amendments could expose an additional 47 to 61 million people to robocalls that previously required consent, the Commission must consider these concerns and the increase in the magnitude of these concerns.").

*Products*, 511 U.S. 244 (1994), should also apply to agency rules; i.e., unless there is "clear congressional intent" to affect rights retroactively, an agency rule should only apply prospectively if otherwise "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed[,]" *see id.* at 280.

It may well be true that as a general proposition statutory retroactivity analysis should apply to final agency actions; however, a necessary predicate to the success of Defendant's argument here is that the initial Amendment's exception for debts "owed to or guaranteed by the United States" was intended to include "government-insured" loans as well. To this end, Defendant offers evidence that the statutory scheme sometimes uses "guarantee," "owed," and "insured," interchangeably, and that the United States Department of Education issued a report prior to the passage of the Budget Act Amendment arguably lobbying for an exception for any servicer of a loan implicating federal government reimbursement. (Reply 3–4.) But this ignores the plain language of the Amendment, the previously discussed careful calibration of the FCC Order (which the Court may examine as persuasive authority), and the fact that our own circuit has conspicuously noted the difference between the varying "layers" of FFELP guarantees and insurances. *Chae v. SLM Corp.*, 593 F.3d 936, 939 (9th Cir. 2010) (summarizing three layers of FFELP transactions—(1) borrower to lender; (2) guaranty agency to lender; and (3) Department of Education to guaranty agency—each of which offers an opportunity for the relevant debtee to contact the initial borrower and obtain repayment). Presented with such evidence, the Court declines to depart from the plain language of the statute.

In sum, the Court concludes that the new exception to the TCPA created by the Budget Act Amendment applies solely when the calls are made during a period in which the United States' obligations as the ultimate guarantor or debtee have been triggered and are active.

/ / /

/ / /

## II. Vicarious Liability

In 2013, the FCC clarified that the "TCPA contemplates that a seller may be vicariously liable under agency principles for violations of section 227(b) . . . ." *In re DISH Network, LLC*, 28 F.C.C. Rcd. 6574, 6590 n.124 (2013); *see also Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 679 (9th Cir. 2014) (quoting the same). The FCC further instructed that federal courts should turn to the federal common law of agency, and that vicarious liability under the TCPA could be established by "a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *In re DISH Network, LLC*, 28 F.C.C. Rcd. at 6584; *see also Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877–88 (9th Cir. 2014), *aff'd*, 136 S. Ct. 663 (2016), *as revised* (Feb. 9, 2016).

In the present case, Defendant argues that it may not be held liable under any theory of vicarious liability. Plaintiff argues that Defendant may be held liable under three theories of vicarious liability: (a) "classical" agency via subagency; (b) implied actual authority; and (c) ratification. The Court addresses each theory in turn.

### A. *"Classical" (Express Actual Authority and Subagency)*

An entity may be liable for actions it did not itself take when the unlawful acts were performed by an agent of the entity. *See generally* Restatement (Third) of Agency (2006). "An agent is one who '*act[s]* on the principal's behalf and subject to the principal's control.'" *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010) (citing Restatement (Third) of Agency § 1.01)). "To form an agency relationship, both the principal and the agent must manifest assent to the principal's right to control the agent." *Id.* This in turn implicates "the degree of control exercised by the principal over the activities of the agent." *In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997). Agency is not established when "control may be exercised only as to the result of the work and not the means by which it is accomplished[;]" in such a case "an independent contractor relationship exists." *Id.*

/ / /

Plaintiff asserts that NSI was Defendant's agent for purposes of hiring contractors, (Opp'n 11–13), and that pursuant to that agency relationship "NSI had actual authority from USAF to hire the Collectors as subagents[,]" (*id.* at 15). Defendant argues that NSI is merely an independent contractor: "USAF contracts with NSI to handle its collection efforts, and NSI is permitted to retain subcontractors . . . to assist." (Reply 11.) The Court agrees with Defendant.

As noted above, to succeed in proving an agency relationship a party must show an alleged principal's right to control more than just the result of an alleged agent's work, "specifically, the manner and means of the [activities] they conducted." *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012), *aff'd*, 582 F. App'x 678 (9th Cir. 2014). In the present case, the evidence indicates that Defendant controlled only the outcome of NSI's work, rather than the manner and means by which it was accomplished. As an initial matter, Defendant contracted with NSI for approximately twelve services, (Service Agreement Ex. A), only one of which is at issue in this case. For the service here at issue, NSI was not "required to use any particular subcontractor recommended by USA Funds[,]" (*id.* art. III.B), and Defendant was neither permitted to change the conduct of nor explicitly granted a contractual right to terminate any NSI-hired Collectors, (*see id.*; Tharp Dep. 65:16–70:16). This follows naturally from the fact that Defendant and NSI structured their relationship "[a]s independent contractors" without "any right to make commitments of any kind or to create any obligation for or on behalf of the other without the prior written consent of the other party," except in limited circumstances. (Service Agreement art. III.A.1.) And while Defendant and NSI met "annually to review the previous year's experience and to discuss and share ideas and to communicate USA Funds' desired vision regarding the philosophies and strategies for defaulted Loan collections for the upcoming fiscal year[,]" the resulting yearly plan NSI was to produce could only be reviewed by Defendant "for compliance with the Act and [the preexisting] Agreement." (*Id.* art. III.M.) Even consumer complaints Defendant received would be forwarded on to NSI, (Tharp Dep. 49:7–11, 138:11–17), pursuant to Defendant's internal guidelines, (*see id.* 100:3–21), and

Defendant and NSI's contractual relationship, (*see* Service Agreement art. III.B).[3] This evidence strongly suggests that Defendant did not maintain sufficient control over NSI's activities to constitute an agency relationship.

      Plaintiff's strongest argument to the contrary is that "[a]t least quarterly" NSI had to provide to Defendant "[p]erformance data for the entire USA Funds portfolio of defaulted Loans and for each collection vendor, including collection vendor performance rankings[,]" and "[a] written report on borrower litigation relating to Loans . . . ." (*Id.* art. III.M.) Additionally, if one of Defendant's audits revealed low scores for a particular Collector, Defendant could submit a recommendation for either "suspension of placement to a given vendor or a decrease in placements over a given time period . . . ." (Verbrugge Dep. 41:21–25.) However, reviewing NSI and its Collectors' work and making recommendations for improvement does not constitute control over the manner and means by which NSI and its Collectors achieve results for Defendant. NSI was not required to—and did not always—take Defendant's post-audit recommendations. (*Id.* 42:15–43:7.) Of course, Defendant had the power to terminate NSI if it felt the contractual relationship was no longer beneficial. But to extend vicarious liability to such a circumstance would result in almost any long-term contract automatically creating an agency relationship unless the hiring entity turned a completely blind eye to the contract once it was signed. *See Thomas*, 879 F. Supp. 2d at 1086 ("[K]nowledge, approval, and fund administration do not amount to controlling the manner and means of the [TCPA-violating] campaign."). Along these same lines, that here Defendant required "all collection vendors on first placements of defaulted Loans [to] be within 87% of the top performing collection agency on first placement of defaulted loans[,]" (Service Agreement art. III.M), does not exhibit sufficient

---

[3] This in turn reveals the common-sense meaning of Defendant's and NSI's contractual provision that Defendant would "[p]rovide prompt direction to [NSI], as required or requested, in resolving issues that arise from Lenders, Educational Institutions, and Borrowers." (Service Agreement art. IV.2.) Defendant did not handle complaints regarding collectors; therefore, the only reasonable inference regarding this lone contractual provision is that Defendant would be available to NSI if a particular entity or person had a question the only answer to which was within the sole possession of Defendant.

control to establish an agency relationship. NSI maintained the ability to use (and terminate) any Collector of its choosing, an ability the Service Agreement did not provide to Defendant. Thus, Defendant's requirement that newly defaulted loans be serviced by the upper echelon of Collectors was affected in the ultimate sense entirely by NSI's independent decisionmaking as to the Collectors it used.[4]

Even assuming that NSI possessed actual authority from Defendant to hire Collectors as subagents, an agent still may only act pursuant to authority actually granted by the principal or authority the agent "reasonably believes" was granted by the principal. Restatement (Third) of Agency § 2.01. In other words, even if Defendant authorized NSI as its agent to hire Collectors, some of whom ultimately violated the TCPA, it does not necessarily follow that Defendant granted NSI authority to hire Collectors who would violate the TCPA. Plaintiff argues that Defendant's yearly audits of the NSI-hired Collectors amounted to a conferral of actual authority to the Collectors to engage in TCPA violations, but offers no evidence that the audits monitored TCPA compliance at all. (Opp'n 15.) In fact, most audits Defendant performed were federally mandated under the FFELP and thus had nothing to do with the TCPA. (*E.g.*, Tharp Dep. 76:1–14.) This is unsurprising, because, as previously discussed, Defendant's countervailing evidence shows that as against the NSI-hired Collectors Defendant had no ability to change their conduct, take direct adverse action against them, or handle consumer complaints against them. (*Supra* note 3 and accompanying text.) In sum, Plaintiff has not shown sufficient

---

[4] It is even less likely that the Collectors constituted subagents of Defendants. "A person appointed by an agent to act on behalf of the agent's principal is a subagent if the appointing agent has agreed with the principal that the appointing agent shall be responsible to the principal for the agent's conduct." Restatement (Third) Of Agency § 3.15, cmt. b. Here, the Service Agreement explicitly provides that NSI "shall be responsible for performance of subcontracting arrangements with respect to <u>all or any portion of this Agreement</u> in accordance with the terms and conditions of this Agreement and the [relevant federal and state] requirements . . . ." (Service Agreement art. II.B); *see Lushe v. Verengo Inc.*, No. CV 13-07632 AB R, 2014 WL 5794627, at *5 (C.D. Cal. Oct. 22, 2014) (finding triable issue of fact, even though the "evidence [wa]s not overwhelming," as to agency and sub-agency relationship because the defendant "reviewed, edited, and provided input" for calling scripts, the defendant would review the "call recordings," and the relevant service agreements did <u>not</u> stipulate that the parties "would perform the contract in compliance with all applicable federal and state law").

control by Defendant over the NSI-hired collectors or the methods by which NSI accomplishes the goals set forth in Defendant's and NSI's service contract to create a triable issue of fact as to liability under "classical" agency principles of express actual authority and subagency.[5]

### B. Implied Actual Authority

Assuming the existence of an agency relationship between Defendant and NSI and a subagency relationship between NSI and the NSI-hired Collectors, Plaintiff again attempts to show that because the NSI-hired Collectors were permitted to take certain actions affecting Defendant's legal rights it was therefore reasonable for the Collectors to assume they had implied actual authority to act directly on Defendant's behalf. (Opp'n 19–20.) Specifically, Plaintiff argues that the NSI-hired Collectors were permitted to accept payments on Defendant's behalf, and to offer extensions on payment deadlines without first contacting Defendant. However, the unremarkable fact that the NSI-hired Collectors were <u>permitted to perform their jobs</u> pursuant to their exclusive contracts with NSI—i.e., accept payments satisfying the debtors' underlying debts as instructed by NSI—does not confer implied actual authority for the Collectors to act as agents for Defendant, nor to breach the TCPA in so doing. *See* Restatement (Third) of Agency § 8.09 ("An agent's interpretation of a principal's manifestations and understanding of a principal's objectives must be reasonable."). And Plaintiff's argument that when Defendant's yearly audit indicated no problems with a NSI-hired Collector Defendant therefore "approve[d]" of the

---

[5] Plaintiff's citation to *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817 (N.D. Ill. 2016)—which Plaintiff characterized at oral argument as speaking directly to a defendant's liability for mere "willful ignorance" of potential TCPA violations—aside from being out of circuit, is readily distinguishable. Although the *Aranda* Court found a genuine issue of material fact concerning a finding of actual authority, that was because the relevant contractual agreements required the subcontractor to provide one of the defendants with "an exact telephone script along with an exact audio file of each" communication, "and evidence in the record show[ed] that on at least one occasion, [the defendant's] attorneys proposed edits to the survey script being used." *Id.* at 832. Further, there was sufficient evidence to suggest that several of the defendants were alter egos, *id.*, and thus enjoyed a much closer relationship than the parties here.

Collector's processes, procedures, and collection efforts is similarly unavailing. (Opp'n 20.) As previously mentioned, *supra* Section II.A, there is no indication that Defendant's audits even encompassed TCPA compliance. And even if they did, the fact that Defendant's audits of particular Collectors did not reveal any violations even though they allegedly were, in fact, occurring, is insufficient to establish a reasonable belief on the part of those NSI-hired Collectors that Defendant impliedly granted them actual authority to breach the TCPA. In sum, as above, Plaintiff has not produced sufficient evidence to create a triable issue of fact as to an implied actual authority theory of vicarious liability.[6]

### C. Ratification

Plaintiff's final argument is that "even if the Collectors were not in an agency relationship with USAF (or were acting outside its scope), a jury could easily find that USAF ratified their conduct nonetheless." (Opp'n 20.) However, Plaintiff's argument directly ignores controlling Ninth Circuit authority: "Although a principal is liable when it ratifies an originally unauthorized tort, the principal-agent relationship is still a requisite, and ratification can have no meaning without it." *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003). Here, as addressed above, *supra* Section II.A–B, Defendant did not exercise sufficient control over the NSI-hired collectors to establish an agency relationship and a corresponding grant of either express or implied actual authority. And because there is no principal-agent relationship established between Defendant and NSI, there can be no corresponding principal-agent relationship established between Defendant and the NSI-hired contractors via subagency. Accordingly, on these facts there can be no ratification.

///

///

---

[6] Plaintiff also offers one instance of a potential TCPA violation being noted in an audit report, (*see* Tharp Dep. 90:10–16), and one instance of Defendant directing NSI or its Collectors to cease contact with a specific borrower in response to a lawsuit against Defendant, (Verbrugge Dep. 107:4–6). However, Plaintiff in neither instance identifies the relevant Collector nor explains why an isolated instance would create a reasonable belief of implied actual authority in the contacted Collector, let alone other, distinct Collectors.

## CONCLUSION

Given the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment for failure to establish a genuine issue of material fact regarding vicarious liability. Accordingly, the Court also **DENIES AS MOOT** Plaintiff's Renewed Motion for Class Certification and Defendant's Motion to Strike. Because this concludes the litigation in this matter, the Clerk **SHALL** close the file.

**IT IS SO ORDERED.**

Dated: February 27, 2017

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge